Russell William **RAMEY**, and Robert Cohen, on behalf of each and on behalf of all others similarly situated, Plaintiffs,

v.

Nelson **ROCKEFELLER**, Governor of the State of New York, et al., Defendants.

Toby **GUTWILL**, on behalf of herself and all others similarly situated, and Richard Yolken, on behalf of himself and others similarly situated, Plaintiffs,

v.

Nelson **ROCKEFELLER**, Governor of the State of New York, et al., Defendants.

Civ. Nos. 71–C–1282, 71–C–964.

United States District Court,
E. D. New York.

Oct. 3, 1972.

---

6. 277 F.2d 664 (2d Cir. 1960).

7. *Id.* at 667.

Burt Neuborne, New York City (Bruce J. Ennis and Arthur Eisenberg, New York Civil Liberties Union, New York City, of counsel), for plaintiffs Ramey and Cohen.

Seymour Friedman, Brooklyn, N. Y., for plaintiffs Gutwill and Yolken.

A. Seth Greenwald, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York and Samuel A. Hir-

showitz, First Asst. Atty. Gen., New York City, of counsel), for defendants Nelson Rockefeller and John P. Lomenzo.

Melvyn Tanenbaum, Asst. County Atty. (George W. Percy, Jr., County Atty., Suffolk County, Riverhead, N. Y., of counsel), for defendants Everett F. McNabb, Frank Coveney and Suffolk County Board of Elections.

Before FRIENDLY, Chief Circuit Judge, MISHLER, Chief District Judge, and BARTELS, District Judge.

FRIENDLY, Chief Circuit Judge:

We deal here with two complaints filed in August and September, 1971, by students living in dormitories at the State University of New York, at Stony Brook, Suffolk County, Long Island. The complaints, both seeking designation as class actions, ask for an injunction against the enforcement and a declaration of the unconstitutionality of § 151 of the New York Election Law, McKinney's Consol.Laws, c. 100, which we reproduce in the margin.[1] The indi-

---

1. "§ 151. Gaining or losing a residence

(a) For the purpose of registering and voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any institution of learning; nor while kept at any welfare institution, asylum or other institution wholly or partly supported at public expense or by charity; nor while confined in any public prison. Any person applying for registration who claims to belong to any class of persons mentioned in this section shall file with the board taking his registration a written statement showing where he actually resides and where he claims to be legally domiciled, his business or occupation, his business address, and to which class he claims to belong. Such statement shall be noted in the register opposite the name of the person so registered or, where permanent personal registration is in effect, the words 'Statement of temporary absence filed' shall be entered in the 'remarks' space on the face of his permanent registration records.

The statement shall be attached to the register or to where permanent personal registration is in effect, the registration serial number of the voter shall be placed on such statement and such statement shall be returned with the registration records to the board of elections.

(b) As used in this article, the word 'residence' shall be deemed to mean that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return.

(c) In determining a voters qualification to vote in a particular election district, the board to which such application is made shall consider, in addition to the applicant's expressed intent, his conduct and all attendant surrounding circumstances relating thereto. The board taking such registration may consider the applicant's financial independence, business pursuits, employment, income sources, residence for income tax purposes, age, marital status, residence of parents, spouse and children, if any, leaseholds, situs of personal and real property owned by the applicant, motor vehicle and other personal property registration and such other factors that it may reasonably deem

vidual plaintiffs in the *Ramey* action are Russell William Ramey, who was a 19 year old sophomore as of the filing of the complaint, and Robert Cohen, who was then aged 20, and was scheduled to graduate in June, 1972. The individual plaintiffs in the *Gutwill* action are Toby Gutwill, who was a 19 year old sophomore, and Richard Yolken, who was a 22 year old junior. All had attempted to register in Suffolk County during the summer of 1971 and the *Ramey* plaintiffs, at least, had filed affidavits as requested by the Board of Election, but had then been refused permission to register. On November 17, 1971, an order was entered convening a three-judge court pursuant to 28 U.S.C. §§ 2281, 2284, and a hearing was scheduled for December 20, 1971.

Meanwhile, proceedings involving similar claims had been instituted in the New York courts. In October, 1971, 176 dormitory residents at Stony Brook, not including the four individual plaintiffs in these actions, but represented by the same counsel who represents the plaintiffs in *Ramey*, filed a petition in the Supreme Court of New York for Suffolk County for review of the refusal of the Board of Elections to allow them to register. The action, then entitled Blumenthal v. Suffolk County Board of Elections, came before the late Mr. Justice Ritchie who on October 22 ruled that it was error for the Board of Elections summarily to deny registration to the students on the ground that they were dormitory residents. He directed that the petitioners be allowed to reapply before the November election, and that they answer a questionnaire prepared by him which would form the basis for the Board's decision. Eighty-three of the petitioners submitted questionnaires but the Board of Elections accepted only two applicants, a married couple. The rejected 81 sought supplemental relief, the title of the proceeding having been

changed to Palla v. Suffolk County Board of Elections, before Mr. Justice DeLuca on November 1. Justice DeLuca found that the affidavits qualified such of the petitioners who had not registered elsewhere for registration at Stony Brook and directed that these, 64 in number, be allowed to register and vote in the November, 1971 election.

With the Supreme Court's decision in *Palla* on appeal to the Appellate Division, the proceedings in the New York courts seemed to offer hope of both an authoritative interpretation of the 1971 amendments to § 151 discussed below, and a resolution of the precise issue involved here. Therefore, at the request of counsel for the *Ramey* plaintiffs, we deferred our hearing pending the outcome of the proceedings in the New York courts.

The New York courts have now completed their initial consideration of the State proceedings. The Appellate Division for the Second Department reversed the decision of Justice DeLuca, 38 A.D. 2d 84, 327 N.Y.S.2d 739 (1971), holding, in an opinion by Mr. Justice Benjamin, that the issues of fact must be resolved on the basis of sworn testimony in open court rather than answers to questionnaires or affidavits, and remanded for hearing in each case. Plaintiffs appealed to the Court of Appeals, where the case was considered along with two others relating to students at other New York universities and colleges. On June 7, 1972, a unanimous court, speaking through Judge Scileppi, held the New York statutes to be constitutional and approved the ruling of the Appellate Division for the Second Department in *Palla*. Palla v. Suffolk County Board of Elections, 31 N.Y.2d 36, 334 N.Y.S.2d 860 (1972). Upon the representation of counsel for the plaintiffs in *Ramey* that he doubted whether the *Palla* decision was a final judgment subject to Supreme Court review under 28 U.S.C. §

necessary to determine the qualification of an applicant to vote in an election district within its jurisdiction. The decision of a board to which such applica-

tion is made shall be deemed presumptive evidence of a person's residence for voting purposes."

1257, we set argument on defendants' motion to dismiss and plaintiffs' request for injunctive and declaratory relief.

■■ We confront at the outset a contention by the defendants, citing *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 419, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), that the judgment in *Palla* operates as *res judicata* and precludes our consideration of plaintiffs' constitutional claims. We have an initial puzzlement how this could be so if plaintiffs are right in believing, as we think they are, that *Palla* had not yet reached the degree of finality required to permit Supreme Court review. See Restatement of Judgments § 41 (1942). There are additional grounds, however, for rejecting defendants' argument. The individual plaintiffs in these actions were not parties to *Palla*, and the latter was not a class action.[2] We know of no basis for holding that the mere fact that the same attorney represented the parties in another action that has gone to judgment makes the latter *res adjudicata* against his client. Finally, even if we thought the *Ramey* plaintiffs bound by the determination in *Palla*, this would not affect the plaintiffs in *Gutwill*. We therefore turn to plaintiffs' constitutional claims.

Before discussing these questions, further elaboration of the New York Constitution and statutes will be useful. Article II, section 1 of the Constitution, which can be traced back to Article 7 of the Constitution of 1777, confers the right to vote on every citizen of the age of 21 or over who "shall have been a resident of this state, and of the county, city, or village for three months next preceding an election." This provision is carried forward in § 150 of the Election Law. In light of the Twenty-Sixth Amendment, 21 must now be read as 18, see Formal Op. No. 35–B, VIII Att'y Gen'l Rep., No. IV (Mar.–Apr. 1972), and in light of Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), three months must now be read as 30 days, see Atkin v. Onondaga County Board of Elections, 30 N.Y.2d 401, 334 N.Y.S.2d 377 (1972). Article 2, § 4, which can be traced back to Art. 2, § 3, of the Constitution of 1846, states:

§ 4. [Certain occupations and conditions not to affect residence]

For the purpose of voting, no person shall be deemed to have gained or lost a residence, by reason of his presence or absence, while employed in the service of the United States; nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any almshouse, or other asylum, or institution wholly or partly supported at public expense or by charity; nor while confined in any public prison.

The essence of this has long been in the Election Law;[3] until 1971 its substance, in somewhat more modern form, constituted the whole of § 151. After adoption of the Twenty-Sixth Amendment the 1971 legislature made this, with some minor modifications, § 151(a), and added the new sections (b) and (c), quoted in footnote 1. Laws of N.Y.1971, ch. 1096, effective July 2, 1971.

■■ We find little force in plaintiffs' contention that the singling out of

---

2. Of the two other actions considered by the New York Court of Appeals along with *Palla*, *Bell v. Rossi* was not a class action; while the Court of Appeals characterized *Gorenberg v. Onondaga County Board of Elections* as "a class action on behalf of students at Syracuse University," 31 N.Y.2d at 43, 334 N.Y.S.2d at 863, this class did not embrace students at Stony Brook. Moreover, the characterization seems to rest solely on the caption of the complaint; we can see no determination by the state courts in *Gorenberg* that a class action was appropriate or that representation was adequate. We would be loathe to extend the concept of *res adjudicata* to class actions, particularly those involving constitutional claims, without such protection for absent class members.

3. The substance of the constitutional mandate first appeared in the Election Law of 1896, ch. 909, § 34, subdiv. 2.

students and certain other classes in § 151(a) is an unconstitutional discrimination. So far as the language, "no person shall be deemed to have gained or lost a residence by reason of his presence . . .," is concerned, this cannot reasonably be read as outlawing all consideration of "presence". Obviously the legislature did not mean to deny that a student's presence in the state meets the element of "physical presence" required to establish a domicile of choice, Restatement (Second) of the Conflict of Laws §§ 15(2)(a), 16 (1971). The words say to us only that presence of a former non-domiciliary as a student within the state is not *alone* sufficient to supply, nor is absence of a former domiciliary as a student *alone* sufficient to lose, the required mental element. This reading, which fits comfortably within common law notions of the intention needed for acquiring domicile, has been adopted by the New York Court of Appeals. Palla v. Suffolk County Board of Elections, *supra*, 31 N.Y.2d at 47, 334 N.Y.S.2d at 867.

■■ We see nothing constitutionally impermissible in New York's having thus enumerated certain categories of persons who, despite their physical presence, may lack the intention required for voting, persons who, in the Supreme Court's words, "present specialized problems in determining residence." Carrington v. Rash, 380 U.S. 89, 95, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965). Indeed, the Court there implicitly approved a Texas statute doing precisely this, so long as persons within the categories, including students, "are given at least an opportunity to show the election officials that they are bona fide residents." *Id.* See also 380 U.S. at 91–92 n. 3, 85 S.Ct. 775, 780, and Wilson v. Symm, 341 F.Supp. 8 (S.D.Tex.1972). It is immaterial that the fertile brains of able counsel have been able to conceive of other categories possessing elements of transiency or involuntariness similar to the five listed in § 151(a). It is not a violation of equal protection to select for individual inquiry categories

of citizens presenting the most obvious problems, Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489, 75 S. Ct. 461, 99 L.Ed. 563 (1955); Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 50–51, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), as long as the ultimate standard is the same for all, as it is here. Beyond this it is worth noting that § 151(a) is not simply a disenfranchising provision; it may often operate as a franchise preserving provision, as for the New Yorker long absent in the service of the United States or as a student in some other state or foreign country.

■ We likewise reject the contention that § 151(a) violates § 101(a) of the Civil Rights Act of 1964, 78 Stat. 241, 42 U.S.C. § 1971(a)(2)(A), which provides:

(2) No person acting under color of law shall—

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

This provision was enacted as part of Title I of the Civil Rights Act of 1964, which was "designed to meet problems encountered in the operation and enforcement of the Civil Rights Act of 1957 and 1960, by which the Congress took steps to guarantee to all citizens the right to vote without discrimination as to race or color." H.R.Rep.No.914, 88th Cong., 1st Sess. 19 (1963). Specifically, this provision was intended to deal with the "[d]iscriminatory use of literacy tests and other devices." *Id.* Plaintiffs have pointed to nothing in the legislative history which would indicate a Congressional intention to give the quoted provision a scope broader than the rest of the statute. Moreover, when the Court

in Carrington v. Rash, *supra,* 380 U.S. at 95, 85 S.Ct. at 779, approved Texas's provisions for special scrutiny of the residence of students and others who "present specialized problems in determining residence," it presumably was aware of the 1964 statute.

We turn therefore to the claim that § 151(b) and (c), more particularly the former, violate the Equal Protection Clause of the Fourteenth Amendment.[4] We start from the proposition, stated in Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965), that a state "is free to take reasonable and adequate steps . . . to see that all applicants for the vote actually fulfill the requirements of bona fide residence." We recognize that the Court has taken an increasingly severe approach under the equal protection clause to state laws which restrict the right to vote, compare Drueding v. Devlin, 234 F.Supp. 721 (D.Md.1964), aff'd, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), with Dunn v. Blumstein, *supra,* 405 U.S. at 337, 92 S.Ct. 995. However, the Court has time and again reaffirmed its words in *Carrington,* quoted above, and its further statement in that case, 380 U.S. at 93–94, 85 S.Ct. at 779, "We stress—and this is a theme to be reiterated—that Texas has the right to require that all military personnel enrolled to vote be bona fide residents of the community." See Kramer v. Union Free School District No. 15, 395 U.S. 621, 625, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Evans v. Cornman, 398 U.S. 419, 421, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); Dunn v. Blumstein, *supra,* 405 U.S. at 343, 92 S.Ct. 995. Indeed, the Court in *Dunn* acknowledged that "[a]n appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny." 405 U.S. at 343–344, 92 S.Ct. at 1004. Such a requirement stands, and has been recognized by the Court to stand, on a quite different basis from poll taxes, Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); property ownership, Kramer v. Union Free School District No. 15, *supra;* and durational residency requirements, Dunn v. Blumstein, *supra.*

We thus turn to the question whether, in the Supreme Court's words, the New York test is "appropriately defined." Before determining the permissible tests of bona fide residency, we must first consider the state interests which the test of bona fide residence serves. The Supreme Court in *Dunn* indicated that such a requirement might be necessary "to preserve the basic conception of a political community." The New York Court of Appeals has said that the "mischief against which the law was aimed was 'the participation of an unconcerned body of men in the control through the ballot box, of municipal affairs in whose further conduct they have no interest and from the mismanagement of which by the officers their ballots might elect they sustain no injury.'" Robbins v. Chamberlain, 297 N.Y. 108, 111–112, 75 N.E.2d 617, 618 (1947). The state argues here that "New York is seeking to insure that all voters have a true feeling of responsibility for the acts of their elected officials. The laws passed and the acts taken by those officials have a permanency far beyond the limited period that the student is at the college."

4. We are unable to accept the suggestion that these two subsections are aimed only at the categories listed in subsection (a). Subsection (b) uses the phrase "[a]s used in this article" rather than "in this section." While it might have been preferable drafting to include the new subsections in § 150 rather than in § 151, this is altogether too slender a basis for attributing to the New York Legislature an intention which is contrary to its words and would indeed raise most serious constitutional problems. And, although § 151(b) and (c) were added only one day after the ratification of the 26th Amendment, the court in *Palla* considered these sections merely as codifications of criteria outlined in prior decisional law. 31 N.Y.2d at 47, 334 N.Y.S. 2d at 867.

Elaborating on this, it can be argued that a test of intention to remain "permanently" or "indefinitely" is constitutionally permissible because a person who does not have such a long-range interest in the community will have voting choices that are distorted in accord with the limited nature of his interest. He may be less likely to vote for financing of such long-term needs as schools or roads if he has no intention of remaining in the community beyond a fixed future date or, *per contra*, may be more likely to vote for improvements in whose costs he will not long have to share. The Supreme Court was faced with essentially these same arguments in *Carrington,* but was not required to rule on them in view of the concession that the petitioner there did have the requisite intention.

Against this it is contended that, in these days of an increasingly mobile society, it would be the rare citizen who could swear honestly that he intended to reside at his present address permanently; even if the test of indefinite intention is different, there would undoubtedly be many citizens with "definite" hopes of moving to better job opportunities, more pleasant climates, and the like. If such a test were in fact imposed on all citizens, it would go too far in restricting the vote to the more immobile elements of the populace; it would penalize, perhaps irrationally, those who make definite plans, while allowing the drifters who have uncertain plans to vote. And if the test were in fact only applied to students, then it would be an impermissible discrimination against them.

■ Thus, we think that the only *constitutionally permissible test is one* which focuses on the individual's present

intention and does not require him to pledge allegiance for an indefinite future. The objective is to determine the place which is the center of the individual's life now, the locus of his primary concern. The determination must be based on *all* relevant factors; it is not enough that a student, or any other former non-domiciliary, would find that the place of his presence is more convenient for voting or would enable him to take a more active part in political life. The state may insist on other indicia, including the important one of abandonment of a former home.

■ We think therefore that, in determining bona fide residence for a person physically present, the state cannot constitutionally go further than the test set out in the Restatement (Second) of the Conflict of Laws § 18 (1971), namely, that he "must intend to make that place his home for the time at least." Important points for consideration are that "The search in each instance is for the state to which the person is most closely related at the time;" and that a person can have the proper attitude to require a domicile even if he intends to move at a fixed time in the future; but that on the other hand, "The required attitude of mind involves to a certain extent the idea of fixity;" and that a person does not have a domicile at a place if he has the intent to return to another that had been his home. Also relevant are the principle, enunciated in the first Restatement, that "[t]he intention required for the acquisition of a domicil of choice is an intention to make a home in fact, and not an intention to acquire a domicil," Restatement of the Conflict of Laws § 19 (1934), and the factors listed in § 13 as suitable for consideration in determining whether a dwelling place is a person's home,[5] which

---

5. "c. *Factors important in determining home.* In determining whether a dwelling-place is a person's home, consideration should be given to:
 1. Its physical characteristics;
 2. The time he spends therein;
 3. The things he does therein;
 4. The persons and things therein;

 5. His mental attitude toward the place;
 6. His intention when absent to return to the place;
 7. Elements of other dwelling-places of the person concerned."
Restatement of Conflict of Laws § 13, comment c, at 25 (1934).

were noted with seeming approval in Texas v. Florida, 306 U.S. 398, 413–414, 59 S.Ct. 563, 83 L.Ed. 817 (1939). In saying that the formulation of the Restatement of Conflicts of Laws with respect to intention to have a home represents the boundary of permissible requirements with respect to residence, we are not suggesting that the framers of the Fourteenth Amendment meant to impose on the states a mandate to define residence for voting purposes in strict accordance with a definition in a Restatement not to be born for the better part of a century. Rather the formulation of the Restatement seems to us to give proper weight to the opposing considerations we have discussed and thus to constitute "an appropriately defined . . . requirement of bona fide residence" which, if "uniformly applied", the state may consider "necessary to preserve the basic conception of a political community." Dunn v. Blumstein, *supra,* 405 U.S. at 343–344, 92 S.Ct. at 1004.

 If we looked only at the face of § 151(b) and (c), we would have no sufficient basis for holding them to be unconstitutional. To be sure, § 151(b) uses the word "permanent". But, as the Restatement says with respect to "indefinitely", the phrase used by the Supreme Court in Carrington v. Rash, *supra,* 380 U.S. at 94, 85 S.Ct. 775, such expressions "should not be taken literally" but rather capsulate the many elements relevant to determining whether a person has made a place his home. The factors for consideration listed in § 151(c) seem appropriate enough, even in the case of students. We likewise see nothing wrong in making the decision of the board of elections "presumptive evidence," provided, as clearly is the case, that the presumption is rebuttable. This goes no further, indeed perhaps less far, than the substantial evidence rule almost uniformly provided with respect to factual determinations of federal administrative agencies and invariably sustained.

The serious question relates not to the face of the statutes but from the attitude concerning residence that New York has taken over the years. It is not difficult to find decisions of the Court of Appeals prescribing for students a test of intention that goes well beyond the Restatement's definition of intention "to make that place his home for the time at least." See, e. g., In re Goodman, 146 N.Y. 284, 40 N.E. 769 (1895); In re Garvey, 147 N.Y. 117, 41 N.E. 439 (1895); In re Barry, 164 N.Y. 18, 58 N.E. 12 (1900); In re Blankford, 241 N.Y. 180, 149 N.E. 415 (1925) (Cardozo, J., saying that the provision of the New York Constitution with respect to students "supersede[s] the rule at common law, whatever that may be"); Watermeyer v. Mitchell, 275 N.Y. 73, 9 N.E.2d 783 (1937) (long-time student clearly having no other home denied registration).

Later New York cases suggest some movement in the direction of the Restatement definition, although perhaps only a slow one. The first is Robbins v. Chamberlain, *supra,* 297 N.Y. 108, 75 N.E.2d 617. In directing registration of students, all married war veterans, who lived in housing rented from the college, albeit in a former army camp many miles from the campus, the court said:

> True, their tenure of occupancy at Shanks Village can continue only while they are students, but, since they have no other homes, their tenure is "temporary" or "indefinite" only in the same sense as the tenure of the occupant of a city apartment house.
>
> . . . These petitioners have shown their eligibility to vote from the only residences they have.

297 N.Y. at 112, 75 N.E.2d at 618. While the court cited Watermeyer v. Mitchell with apparent approval, the two decisions seem basically inconsistent. Section 151(a) makes no distinction between students living in dormitories and in other housing; the only importance of the distinction is that, on the whole, a

student may be less likely to regard a dormitory room as his "home." Similarly, the statute makes no distinction between married and unmarried students, although the former are more likely to have severed the parental link. Very likely the court was content to reach a correct result, while leaving the future of *Watermeyer* for another day.

Reiner v. Board of Elections, 54 Misc. 2d 1030, 283 N.Y.S.2d 963, aff'd mem., 28 A.D.2d 1095, 285 N.Y.S.2d 584 (4th Dept.), aff'd mem., 20 N.Y.2d 865, 285 N.Y.S.2d 95, 231 N.E.2d 785 (1967), followed *Robbins* with respect to a married student couple attending Syracuse University who had rented an off-campus apartment; the Supreme Court justice had stressed not only the off-campus dwelling but that the applicants had presented other facts, notably, that they had all their belongings at their apartment, had registered their car in Syracuse, and had established a savings account there.[6]

While, as later indicated, it would be going too far to say that *Palla* clearly embraced what we regard as the view constitutionally required, there are passages in the opinion that point in that direction. It seems significant that the citation in *Palla*, 31 N.Y.2d at 48, 334 N.Y.S.2d at 867, to *Watermeyer* v. *Mitchell, supra,* was not to the majority opinion but to the dissenting opinion of Judge Finch. Perhaps more important, the court said, in language that would have been constitutionally unexceptionable save for inferences from the earlier New York decisions:

> The issue ultimately must be resolved with respect to each individual applicant on the facts peculiar to his or her case tending to establish the college

community as an adopted home. The determination remains what it has always been, a factual one, evaluated in terms of actual conduct, and further objectified by newly enacted statutory criteria.

31 N.Y.2d at 48–49, 334 N.Y.S.2d at 868. Still further the court stated:

> Where students are in fact residents, intending New York for a permanent home, they, as all other qualified residents, have a right to equal opportunity for political representation.

31 N.Y.2d at 50, 334 N.Y.S.2d at 870. Save for the use of "permanent," the phrase used in § 151(b), rather than "indefinitely," this is precisely the language of Carrington v. Rash, *supra*, 380 U.S. at 94, 85 S.Ct. 755. As previously indicated, both terms can well be read in light of the Restatement's suggestion, § 18, comment c, at 71, that "[e]xpressions such as these should not be taken literally."

But for inferences drawn from the earlier decisions of the New York Court of Appeals, we would thus have little difficulty in upholding the views expressed in *Palla* as comporting with constitutionally permissible tests. However, there are passages where the *Palla* court seemingly approved these cases, and its failure once again to reconcile the inconsistency between them and the *Robbins-Reiner* line of cases excludes the possibility of such a holding at this time. In short, it is too early to determine whether, in light of *Palla* New York will or will not apply a notion of a student's intention to make a dormitory or other room a home that is too rigorous to meet constitutional standards.[7]

---

6. Also, as indicating the recent more liberal views of lower New York courts, see Goldhaber v. Board of Elections, 55 Misc. 2d 111, 285 N.Y.S.2d 747 (Sup.Ct.1967), aff'd mem., 31 A.D.2d 891, 299 N.Y.S. 2d 814 (4th Dept.1969), and Kashman v. Board of Elections, 54 Misc.2d 543, 282 N.Y.S.2d 394 (Sup.Ct.1967).

7. Three other arguments advanced by plaintiffs against the constitutionality of § 151 require only brief discussion. First, plaintiffs claim that the statute abridges students' rights to vote in violation of the Twenty-sixth Amendment. But these students were denied registration because their residency was in doubt and not be-

■ This brings us to the question of proper disposition. Since the meaning of the New York statute remains uncertain, and since it is quite possible that the New York courts will arrive at a construction of it consistent with *Carrington* and *Dunn*, the case seems a classic one for continued abstention on our part. Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970). As we cannot be sure of this, we cannot properly grant the motions to dismiss. Since the case of each person seeking registration must stand on its own facts, the actions are presently inappropriate for class designation.

■ We are thus left with the narrow question whether relief should be granted to any of the four individual plaintiffs. We must confess that, on the facts stated in the complaints, we perceive no basis on which registration could constitutionally be denied to plaintiffs Ramey [8] and Yolken; [9] the other cases are more debatable. However, defendants have had no opportunity to cross-examine or present rebuttal evidence. Moreover, there is nothing to indicate that any of the plaintiffs has reapplied for registration subsequent to the decision in *Palla*. Therefore, we believe that the proper course is for Ramey and Yolken, as well as the other plaintiffs, to return to the Board of Elections to reapply for registration, and thus give the Board and the New York courts the opportunity to dispose of their applications in accord with *Palla*

---

cause of their age. And there is no evidence that Congress and the states, in the enfranchisement of eighteen-year-olds, intended to modify the states' common law rules of residence.

Second, plaintiffs argue that refusal to allow all students to vote in their college communities violates the one-man, one-vote doctrine of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), because the census enumerates them as residents of Stony Brook. Yet there has been no proof that the number of students who attend colleges in the election district encompassing Stony Brook not allowed to vote in New York is any greater than the number of students who vote in that district but attend schools elsewhere. Nor is there any strict correspondence under the one-man, one-vote doctrine between the number of *voters* in an area and the number of representatives it is allowed; rather the correspondence that has been required is between the number of people living in the district and the number of representatives. More fundamentally, we are unwilling to hold that an administrative determination made for purposes of expediency can render unconstitutional a state's application of its common law tests of residence.

Finally, the plaintiffs' claim that § 151 is unconstitutionally vague must be rejected. Although the statutory scheme places the decision on residence on the Board of Elections in the first instance, and the criteria of *bona fide* residence unhappily cannot be mere litmus tests from which a result can be quickly and surely determined, the decision of the Election Board is guided by the factors set out in § 151(c) and is subject to judicial review in accordance with common law rules. It is difficult to see what more could be expected so long as *bona fide* residence, rather than mere presence, may be required. *Cf.* Carrington v. Rash, *supra*, 380 U.S. at 95, 85 S.Ct. 755.

8. According to the complaint, Ramey's parents were divorced in 1958. His father now lives in California; Ramey has not seen him in 10 years. His mother died in 1968. Although Ramey lived briefly with his mother's second husband after his mother's death and prior to his enrollment at Stony Brook, Ramey has not spoken with him in two years and has no intention of returning to live with him. He is financially independent. He has lived in a dormitory room at Stony Brook for two years, including all vacation periods. Although his plans after graduation are uncertain, it is possible that he will remain in Stony Brook to attend graduate school there.

9. Yolken's parents live in New Jersey; however, he abandoned his New Jersey residence permanently and completely in 1968. He has since lived in various locations around the New York area, being supported by welfare. The Welfare Department secured for him a scholarship to attend Stony Brook and still provides for his support. Compare illustration 6 of the Restatement (Second) of the Conflict of Laws *supra*, at 72.

and with our interpretation of the demands of the Federal Constitution.

We shall therefore enter an order of abstention pending further decisional developments in the New York courts.