**Marilyn CARPENTER, Appellant,**

v.

**Jay S. HAMMOND, Governor of Alaska, Appellee.**

No. 6728.

Supreme Court of Alaska.

July 22, 1983.

Holli I. Ploog, Dichter & Ploog, and Francis M. Flavin, Flavin & Wickersham, Anchorage, for appellant.

Thomas M. Jahnke, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal involves a challenge to the 1981 Alaska legislative reapportionment plan promulgated by Governor Jay S. Hammond on July 24, 1981. Following a trial on this matter, the superior court entered a dismissal with prejudice in favor of the Governor and against Marilyn Carpenter, on all claims, except as to the adjustment of the boundary lines for Districts 25 and 26. On appeal, Carpenter raises two challenges to the superior court's decision. First, she argues that the methods used in identifying and excluding certain members of the military and dependents from the reapportionment population base violated the equal protection provisions of the United States Constitution and impermissibly reduced the voting strength of voters residing in districts where the military and their dependents were excluded. Second, she contends that the formation of House Election District 2 (Cordova-Inside Passage) violated Article VI, section 6 of the Alaska Constitution which requires that each new district

created be formed of "contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area."

## I.

*Facts*

In 1979, Governor Jay S. Hammond appointed the Reapportionment Advisory Board (the Board) to assist him in the decennial reapportionment of the state legislative districts.[1] The Board, in a report dated June 10, 1981, submitted its recommended plan for redistricting of the legislature. Governor Hammond, after reviewing the report and making some modifications publicly announced on July 24, 1982, his acceptance of the Board's recommendations and signed the reapportionment proclamation.[2]

In preparing its report, the Board initially had to determine an accurate population base for the reapportionment. It was thought that the United States Census count of 1980 would include a significant number of people who were not in fact residents of Alaska. The Board hired an expert in Alaskan demography and survey research to advise the Board in its assessment and treatment of groups thought to contain large numbers of non-residents. The Board's expert studied various groups, including military personnel and dependents, oil camp workers, lumber camp and fish processing employees, college students, felons, and aliens, to determine the numbers of non-residents likely to be included in the federal census count and their potential impact on state reapportionment. The expert's report concluded that the only group of potential non-residents present in significant numbers, for reapportionment purposes, consisted of military personnel and their dependents. The report contained the recommendation that a study of the military population be conducted at seven installations in the state, including Fort Richardson and Elmendorf Air Force Base in Anchorage, Fort Wainwright and Eielson Air Force Base in Fairbanks, Fort Greely at Delta Junction, the Kodiak Coast Guard Station, and the Adak Naval Base.

In order to ascertain the legal residence of military members and their dependents, the Board decided to conduct a mailed sample survey of military personnel. The survey questionnaire listed seven questions, the first three of which read as follows:

1. Do you consider your home to be in Alaska or some other state?

2. Do you plan to make your home in Alaska or some other state when you leave the military?

3. Are you registered to vote in the State of Alaska?

Military members who answered "Alaska" to the first two questions, or who answered

---

1. Alaska Const., art. VI, § 3 states:
   The governor shall reapportion the house of representatives immediately following the official reporting of each decennial census of the United States. Reapportionment shall be based upon civilian population within each election district as reported by the census. In *Wade v. Nolan,* 414 P.2d 689, 698 (Alaska 1966), this court held that the governor has the constitutional authority to reapportion both the house and the senate, even though Alaska's constitution specifically grants the governor the power to reapportion only the house.
   Alaska Const., art. VI, § 8 provides:
   The governor shall appoint a reapportionment board to act in an advisory capacity to him. It shall consist of five members, none of whom may be public employees or officials. At least one member each shall be appointed from the Southeastern, Southcentral, Central, and Northwestern Senate Districts. Appointments shall be made without regard to political affiliation. Board members shall be compensated.

2. Alaska Const., art. VI, § 10 reads:
   Within ninety days following the official reporting of each decennial census, the board shall submit to the governor a plan for reapportionment and redistricting as provided in this article. Within ninety days after receipt of the plan, the governor shall issue a proclamation of reapportionment and redistricting. An accompanying statement shall explain any change from the plan of the board. The reapportionment and redistricting shall be effective for the election of members of the legislature until the official reporting of the next decennial census.

"yes" to question three were counted as Alaska residents. The next three questions asked the following:

4. How many dependents currently live with you (spouse, children)?

5. How many of these dependents consider their home to be in Alaska *and* intend to make their home in Alaska in the future?

6. How many of these dependents have registered to vote in the State of Alaska?

All dependents who were listed as either considering Alaska their home and intending to make Alaska their home in the future *or* as having registered to vote in Alaska were counted as residents for apportionment. The last question asked the military member to indicate whether the member lived on or off the military base.

Based on the responses to the questionnaires, "non-resident population coefficients" were determined for each installation and surrounding off-base area. These coefficients were used to calculate the estimated "resident" and "non-resident" military/dependent populations at each location. The "non-resident" population figures for each area were totaled (31,363.8) and deducted from the federal census count for Alaska (400,481) producing an adjusted state population base (369,117.2). Using this adjusted figure as the population base for reapportionment, the Board computed the ideal house district population (9,228) and the ideal senate district population (18,-456).[3] The legislative redistricting plan was then drawn up based on these target figures.

In the reapportionment plan recommended by the Board and adopted by Governor Hammond, the City of Cordova was included in House Election District 2 along with several Southeast coastal communities:

District 2 is composed of that portion of Southeast Alaska between Dixon Entrance and Port Gravina on Prince William Sound that is not contained in Districts 1, 3 and 4. Included within its boundaries are the communities of Cordova, Yakutat, Haines, Skagway, Klukwan, Gustavus, Angoon, Kake, Thorne Bay, Klawock, Craig and Hydaburg.

Following Governor Hammond's announcement of the new reapportionment plan, Marilyn Carpenter filed suit raising the following objections to the redistricting plan: the exclusion of military members and dependents from the apportionment population base was a violation of equal protection; in selecting the Advisory Board Governor Hammond violated Article VI, section 8 of the Alaska Constitution which provides that reapportionment board members be appointed "without regard to political affiliation";[4] the failure to identify and exclude other groups of non-residents including fish processing and lumber workers, and personnel and dependents at unsurveyed military installations resulted in an inaccurate apportionment population base and substantial variations from the actual population among the districts;[5] and the inclusion of Cordova in District 2 along with the Southeast coastal communities violated the requirement that districts be compact and socio-economically integrated areas. Alaska Const., art. VI, § 6.

The superior court entered a final judgment of dismissal with prejudice in favor of Governor Hammond on all claims, except as to the adjustment of the boundary lines for Districts 25 and 26, which the state was

---

3. The ideal district populations were obtained by dividing the apportionment population base (369,117.2) by the number of house (40) and senate (20) seats to be apportioned. *See* Alaska Const., art. II, § 1.

4. The superior court granted defendants' motion for partial summary judgment as to Car-

penter's challenge to Governor Hammond's appointment of the Reapportionment Board.

5. Specifically, Carpenter alleged that if nonresident military personnel and fish processing workers had been excluded from District 26, the population of the house district would have been reduced to 7,259, which would represent

ordered to correct within 30 days.[6] This appeal followed.[7]

## II.

*Does Carpenter Have Standing?*

Carpenter asserts that the inclusion of Cordova in District 2 violates the requirements of compactness and socio-economic integration in Article VI, section 6 of the state constitution.[8] The Governor's position is that Carpenter lacks standing to raise this claim because she does not reside in or near the challenged district but resides and votes in Anchorage. The Governor further argues that a plaintiff in a reapportionment suit has no standing to assert the rights of voters in a district in which the plaintiff does not reside or vote.[9]

Carpenter claims that her status as a registered voter of Alaska is sufficient to

over a 20 percent deviation from the ideal house district population of 9,228.

6. The superior court ruled the Board failed to justify its decision to include, as residents, all military members and dependents at the non-surveyed bases:

> Because of the difficulty of access to remote military sites, many of which are tightly secured intelligence posts, and because of the wide dispersal and relatively small size of these remote sites, it was constitutionally permissible for the Governor to forego study of the military at these remote sites. However, because the consistency of results of the surveys done at larger installations made it feasible to apply these results to the smaller installations, such a course of action would have been less restrictive than including all the military at remote sites in the population as the Governor did. The nonresident population of the smaller sites should therefore have been calculated on the basis of available survey data and excluded from the population base.

Exclusion of the non-resident population at the small sites resulted in increased variations from the ideal district size. The superior court "suggested" that an adjustment be made in Districts 25 and 26 so as to bring them within the 10% limit for permissible variations. *See Groh v. Egan,* 526 P.2d 863, 882 (Alaska 1974). The Governor has not appealed this aspect of the superior court's decision.

7. After the appeal had been filed in this court, the Governor filed a motion to dismiss Carpenter's points on appeal, numbered 12 through 24, on the ground that Carpenter lacked standing to assert these issues. This court deferred consideration of this motion until after oral argument. The appeal was expedited in light of the impending 1982 elections.

After oral arguments were heard, this court on June 1, 1982, entered the following order:

1. Appellees' motion to dismiss certain portions of this appeal, upon the ground that appellant lacks standing to raise some of the issues set forth in appellant's points on appeal, is denied.

2. Appellant's claim that the inclusion of Cordova in House District 2 and Senate District B violates Article VI, section 6 of the Alaska Constitution remains under advise-

ment. Otherwise, the judgment of the superior court is affirmed.

3. Pending our determination of the issue remaining under advisement, described in paragraph 2 hereof, the governor's 1981 legislative reapportionment and redistricting plan is approved, as an interim measure, for elections to be held in House District 2 and Senate District B in 1981.

4. An opinion will follow our determination of the remaining issue.

Justice Rabinowitz dissented from paragraphs 2 and 4 of the court's order.

8. Alaska Const., art. VI, § 6, provides in full:

> The governor may further redistrict by changing the size and area of election districts, subject to the limitations of this article. Each new district so created shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. Each shall contain a population at least equal to the quotient obtained by dividing the total civilian population by forty. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible.

9. *Fairley v. Patterson,* 493 F.2d 598 (5th Cir. 1974) and *Shapiro v. State of Maryland,* 336 F.Supp. 1205 (D.Md.1972).

*Fairley* involved a challenge to a county reapportionment plan which excluded certain college students from the population base. In analyzing the standing issue, the court stated:

> Under appellants' first claim, a traditional one man, one vote argument, the Supreme Court has conclusively established in *Baker v. Carr,* 369 U.S. 186, 204–208, 82 S.Ct. 691, [703–705], 7 L.Ed.2d 663 (1962), and *Reynolds v. Sims,* 377 U.S. 533, 554–561, 84 S.Ct. 1362 [1377–1381], 12 L.Ed.2d 506 (1964), that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present. However, injury results only to those persons domiciled in the *under represented* voting districts.

*Fairley,* 493 F.2d at 603. Since the plaintiffs failed to allege residence in one of the under-

establish her standing to attack the reapportionment plan. She relies heavily on Article VI, section 11 of the Alaska Constitution which provides in part:

> Any *qualified voter* may apply to the superior court to compel the governor, by mandamus or otherwise, to perform his reapportionment duties or to correct *any error in redistricting or reapportionment.* (Emphasis added.) [10]

Carpenter argues that this constitutional provision is a general grant of standing to any voter to contest the validity of a proposed reapportionment scheme, without being required to allege any personal injury. The Governor contends that the phrase "any qualified voter" was intended to establish "a jurisdictional threshold, a first step, in addition to which one must establish standing" in order to raise a reapportionment challenge.[11]

■ We hold that Article VI, section 11 of the Alaska Constitution is dispositive of the standing issue, for it is clear that under the provisions of Article VI, section 11 "[a]ny qualified voter" is authorized to institute and maintain a reapportionment suit seeking "to correct any error in redistricting or reapportionment." Nothing in the text of Article VI, section 11, or the relevant portions of the record of the constitutional convention, furnishes justification for a judicial construction departing from the section's unambiguous text.[12] Thus, Car-

---

represented districts, the court held that they lacked standing to assert the "one person, one vote" claim. *Id.* at 604. The court went on to reject plaintiffs' equal protection challenge on the grounds that the plaintiffs had not alleged or demonstrated that they were members of the group (college students) whose rights had allegedly been violated. *Id.* at 604.

In *Shapiro*, the plaintiff alleged racial gerrymandering in the reapportionment of federal congressional districts in Maryland. The district court, in holding that the plaintiff had failed to establish standing, stated:

> While plaintiff has alleged that he formerly lived in a racially balanced 7th District, he has not alleged what the racial mix is in the new 2nd District where he now resides as a result of the changed boundary lines. If there is some constitutional right to live or vote in a racially balanced congressional district (which is doubtful), plaintiff has not alleged facts to show that his new district is not racially balanced. Hence, he does not allege that he has suffered in fact some injury ... sufficient to give him standing to sue on the ground that he has been deprived of an alleged constitutional right to live or vote in a racially balanced congressional district.
>
> If, on the other hand, plaintiff is complaining of constitutional wrongs allegedly done to persons who now live in the revised 7th District, he again fails [to meet the standing test] since he is not a resident of the revised 7th District.

*Shapiro,* 336 F.Supp. at 1208. Applying the analysis of *Fairley* and *Shapiro,* the state asserts that since Carpenter has not alleged residence in District 2, she has not proved the injury in fact required for standing.

**10.** Alaska Const., art. VI, § 11 reads in full as follows:

> *Enforcement.* Any qualified voter may apply to the superior court to compel the gover-

nor, by mandamus or otherwise, to perform his reapportionment duties or to correct any error in redistricting or reapportionment. Application to compel the governor to perform his reapportionment duties must be filed within thirty days of the expiration of either of the two ninety-day periods specified in this article. Application to compel correction of any error in redistricting or reapportionment must be filed within thirty days following the proclamation. Original jurisdiction in these matters is hereby vested in the superior court. On appeal, the cause shall be reviewed by the supreme court upon the law and the facts.

The superior court found that "The plaintiff is a citizen and voter of the United States and the State of Alaska and is entitled to vote for members of the House of Representatives and the Senate of the State of Alaska."

**11.** The Governor cites the rule of construction that constitutions should be read, whenever possible, in harmony with the common law, and argues that the language of Article VI, section 11 should be interpreted as supplementing rather than repealing the traditional standing requirement.

**12.** In *Wade v. Nolan,* 414 P.2d 689, 692 (Alaska 1966), this court, after reviewing the provisions of Alaska's constitution concerning reapportionment, stated:

> It is clear from the foregoing provisions that the Governor, with the assistance of the Reapportionment Board, must reapportion representation in the House of Representatives on a method of equal proportions, every ten years; that he must explain any deviation from the reapportionment plan submitted to him by the Board and that *any qualified voter can invoke the power of the courts to compel him to reapportion or to correct any error*

penter has standing to raise both the military exclusion and the Cordova inclusion issues.

■ Additionally, and apart from Article VI, section 11, we hold Carpenter has standing to challenge the reapportionment plan under this court's decisions pertaining to standing. In *Moore v. State,* 553 P.2d 8, 23–24 (Alaska 1976), we said in part:

> As previous decisions of this court indicate, the concept of standing has been interpreted broadly in Alaska, favoring increased accessibility to judicial forums. In *Coghill v. Boucher,* 511 P.2d 1297, 1303 (Alaska 1973), we noted that "[i]n the past . . . this court has departed from a restrictive interpretation of the standing requirement."

Whether a party has standing to obtain judicial resolution of a controversy depends on whether the party has a sufficient personal stake in the outcome of the controversy. In our recent decision of *Wagstaff v. Superior Court, Family Division,* 535 P.2d 1220, 1225 (Alaska 1975), we described this requirement in terms of "injury-in-fact," and explained that its purpose is to assure the adversity which is fundamental to judicial proceedings. (Footnote omitted.)

In *State v. Lewis,* 559 P.2d 630 (Alaska 1977), *appeal dismissed,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977), citizens/taxpayers challenged the constitutionality of a three-way exchange of land between Alaska, the United States government, and a native regional corporation. Although the plaintiffs did not establish any injury to their personal interests, we held that the plaintiffs' status as citizens constituted a sufficient personal stake in the controversy to guarantee "the adversity which is fundamental to judicial proceedings." *State v. Lewis,* 559 P.2d at 635. In reaching this conclusion we stressed the following factors: that plaintiffs alleged the violation of two specific constitutional provisions; that the disputed transaction would have a significant impact on the state treasury; and that there was no one in a better position than plaintiffs to litigate the complaint. *Id.* at 635.

In the instant case, Carpenter alleges that District 2 violates a specific constitutional limitation and that the disputed transaction (the drawing of election district lines) arguably will have a significant impact on the state.[13] Here the dispute over District 2 has been fully briefed, argued at trial and on appeal, and there is no one in a better position than Carpenter to litigate these issues. In our view, Carpenter also meets the standing criteria of *Lewis.*

### III.

### *Exclusion of Military Members and Dependents*

Carpenter argues that the Board's decision to survey and exclude only non-resident military members[14] is unconstitutional since it resulted in the arbitrary exclusion of the military from the apportionment base, citing *Egan v. Hammond,* 502 P.2d 856 (Alaska 1972). The Governor asserts that the selective treatment of the military is permissible under the reasoning of *Groh v. Egan,* 526 P.2d 863 (Alaska 1974).

In *Groh,* this court held that the Reapportionment Board could exclude military non-residents even though it made no attempt to eliminate civilian non-residents. *Groh,* 526 P.2d at 870. We found the Board's selective treatment of the military was justified because at the time of the federal census civilian transients were not present in significant numbers. Furthermore, we

---

*made by him in reapportioning or redistricting.* (Emphasis added.)

13. Any challenge to a reapportionment plan must be filed within 30 days following the Governor's proclamation. Alaska Const., art. VI, § 11. At the time the case was argued to this court, no one other than Carpenter could have litigated these reapportionment issues.

14. Carpenter also challenged the Board's decision to limit the survey to the seven major military installations. The superior court apparently ruled in Carpenter's favor on this issue since it calculated and excluded the nonresident populations at the remote military bases.

concluded that even if civilian transients were present, they were probably not counted as residents by the federal census. Finally, we found that the involuntary nature of the military member's assignment to the state is distinguishable from a civilian's voluntary presence. *Id.* Carpenter acknowledges *Groh* but argues that its reasoning is inapplicable here.

Carpenter distinguishes *Groh* on the ground that in this case there were a substantial number of civilian transients in the state. The state agrees that the 1980 census contained substantial numbers of civilian non-residents but claims that the Board properly ignored them for the following reasons: the federal census reallocated tourists and temporary business visitors to their true residence; there was no practical and reliable way to survey fish processing and lumber camp employees; the federal census substantially undercounted lumber and fish workers; deduction of some non-resident proportion of these groups would produce serious inaccuracies; and oil camp workers were allocated by the census to their true residences.[15] The state concludes that only military personnel and dependents were present in sufficient numbers and concentrations to impact apportionment.

Next, Carpenter argues that the distinction between military and civilian transience is no longer valid. She cites *Marks v. Township Committee of New Hanover,* 124 N.J.Super. 504, 308 A.2d 24, 26 (App.Div. 1973):

> The fact that the person in military service may reside at his military reservation pursuant to order assignment, rather than as a result of his free and voluntary choice, differentiates him not at all from any other person whose business, employment or other pursuits compel his residence at or near a given community and involve regular or irregular transfer from place to place. (Footnote omitted.)[16]

Finally, Carpenter argues that, even assuming the legal compulsion doctrine justified differential treatment for military personnel, it was unreasonable to apply it to the military dependents. According to Carpenter, none of these dependents are present under legal compulsion and therefore they should have been treated as civilians. Although this issue was not presented in *Groh* (only military personnel were excluded), this court stated that "[d]ependents of military persons may be assumed, for the most part, to have the same residential characteristics as the uniformed personnel upon whom they are dependent."[17]

In *Groh,* 526 P.2d at 869–70, we referred to the fact that in *Egan v. Hammond,* 502 P.2d 856 (Alaska 1972), we held invalid the constitutional requirement that reapportionment be based upon civilian population within each election district as reported by the census, on the ground that military personnel as a class should not be arbitrari-

---

**15.** The state contends that no dispute was raised at trial regarding the inclusion of oil workers, students, or aliens, and that the trial centered on the treatment of military personnel/dependents and fish processing workers.

**16.** Carpenter contends that the legal compulsion rule has been significantly weakened in recent cases and should not be used to justify the selective exclusion of military personnel. Restatement (Second) of Conflicts § 17 (1971) states:

> A person does not acquire a domicile of choice by his presence in a place under physical or legal compulsion.

The cases which Carpenter cites, however, all deal with irrebuttable presumptions. No irrebuttable presumption of non-residence was imposed on the military in this case. The legal compulsion rule was merely one factor which the Board relied on in deciding that military personnel should be surveyed. Although the service members were accorded different treatment, they were given an opportunity to establish their residence. *See Stifel v. Hopkins,* 477 F.2d 1116 (6th Cir.1973) (prisoner not precluded from establishing domicile because his presence in the jurisdiction was originally compelled); *Dane v. Board of Registrars of Concord, et al.,* 374 Mass. 152, 371 N.E.2d 1358 (1978) (prisoners entitled to rebut presumption that by reason of their involuntary presence they have retained their former domicile); *McKenna v. McKenna,* 282 Pa.Super. 45, 422 A.2d 668 (1980) (no irrebuttable presumption that prisoner retains former domicile).

**17.** *Groh v. Egan,* 526 P.2d 863, 874 (Alaska 1974).

ly eliminated. We further noted that by holding such elimination unconstitutional, we were not precluding exclusion of some military personnel providing it was conducted to limit the impact of transients and non-residents on legislative districting. In *Groh,* we upheld the Reapportionment Board's decision to exclude military transients from the apportionment population base. We found the Board's decision reasonable on the following grounds:

(1) it was reasonable for the Board to conclude that civilian transients are not present in significant numbers in April when the census data was obtained;

(2) even if transients were present, they were not included in the Alaska census population, although all military stationed in Alaska were so included;

(3) the special nature of military transience creates a reasonable basis to distinguish between military and civilian transients.[18]

In *Groh,* 526 P.2d at 873 & n. 36, we further said:

It is thus not offensive to notions of equal protection to exclude from the population base even military personnel who have lived in Alaska for substantial periods of time, so long as those people have exercised their option to remain residents and domiciliaries of other states.

. . . .

There is every reason to believe that military personnel who desire to be Alaska residents and domiciliaries will register to vote because voter registration is a prime index of intention to become a resident or domiciliary. For like reason, we think that those who do not want to become Alaskans demonstrate that intention by refusing to register to vote.

Based on our decision in *Groh v. Egan,* we hold that the exclusion of non-resident military members and dependents from the apportionment population base did not violate equal protection,[19] and that the Board's alleged failure to identify and exclude other groups of non-residents including fish processors and lumber workers did not result in an inaccurate population base and substantial variations from the actual populations among the election districts.[20]

**18.** *Id.* at 870.

**19.** The superior court ruled that in applying an equal protection analysis to the exclusion of alleged nonresidents from the apportionment population base, the strict scrutiny test was the proper standard of review. A classification which directly restricts the right to vote must meet strict scrutiny. *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). It is not clear, however, whether this test is the required standard for classifications in apportionment schemes. *See* Casper, *Apportionment and The Right to Vote: Standards of Judicial Scrutiny,* 1973 Sup.Ct.Rev. 1; *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, 536, *reh'g denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). In *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320, 330–31, *modified on reh'g,* 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973), the Court, in assessing the constitutionality of a state legislature's redistricting plan, placed emphasis on the "rational basis" language of *Reynolds:*

So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537. In rejecting the lower court's holding that the state had failed to prove any "governmental necessity" justifying the deviations in the districting plan, the Supreme Court stated:

As we noted above, however, the proper equal protection test is not framed in terms of "governmental necessity" but instead in terms of a claim that a state may "rationally consider."

410 U.S. at 326, 93 S.Ct. at 986, 35 L.Ed.2d at 331. Further, in *Groh v. Egan,* 526 P.2d 863, 870 (Alaska 1974), this court upheld the exclusion of some military members on the ground that the state had advanced a "reasonable basis" for its unequal treatment of the military.

Although we question whether the superior court was correct in its decision to apply a strict scrutiny standard of review in this case, we hold that the Board's exclusion of non-resident military from the reapportionment population base withstands equal protection attack under either a strict scrutiny or a reasonable basis analysis.

**20.** In rejecting Carpenter's contentions regarding the Board's failure to exclude non-resident fish processors and lumber workers, we adopt

We think it clear that a state has a legitimate interest in limiting its apportionment base to bona fide residents. The Supreme Court of the United States has stated that the states may exclude non-residents from the apportionment base. *Burns v. Richardson,* 384 U.S. 73, 92, 86 S.Ct. 1286, 1296–1297, 16 L.Ed.2d 376, 390–91 (1966). As noted previously, in *Groh v. Egan* we held that military non-residents may constitutionally be excluded from the state's population base. In the case at bar, the superior court found that the state, in attempting to exclude non-resident military from the apportionment base, demonstrated a compelling state interest, namely, the prevention of the dilution of its residents' voting

strength.[21] We therefore hold that the state (Board) had a legitimate interest in limiting its apportionment base to bona fide residents, and further, that the means employed by the Board to cull out the non-residents was constitutionally permissible.[22]

## IV.

### *Inclusion of Cordova in District 2*

Carpenter asserts that the inclusion of Cordova in District 2 violates Article VI, section 6 of the Alaska Constitution, which provides:

> The governor may further redistrict by changing the size and area of election districts, subject to the limitations of this article. *Each new district so created*

the findings of fact and legal analysis employed by the superior court in those portions of the decisions which relate to these cases. The relevant portions of the superior court's final judgment are set out in the appendix to this opinion.

**21.** *See Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523–24, *reh'g denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964).

**22.** In regard to our approval of the means employed, see *supra* note 20, concerning the justification for the Board's focusing only on the military as opposed to fish processors and lumber industry personnel.

An additional reason on our part for upholding the superior court's decision that the means employed by the Board in excluding non-resident military was not violative of equal protection is the fact that the record is devoid of any proof on Carpenter's part that adoption of her standards would have made any significant changes in the population base of any election district.

One further aspect of this portion of the appeal needs to be addressed. In order to be counted as a resident, the military members had to indicate that they considered Alaska their home and they planned to make their home here upon discharge, or that they were registered to vote. Carpenter asserts that the first two questions constitute an "indefinite intention" test and that the use of this test to exclude the military from apportionment is unconstitutional. Carpenter relies on *Hershkoff v. Board of Registrars,* 366 Mass. 570, 321 N.E.2d 656, 664 (1974); *Ramey v. Rockefeller,* 348 F.Supp. 780 (E.D.N.Y.1972), and *Newburger v. Peterson,* 344 F.Supp. 559 (D.N.H.1972).

The state argues that *Newburger, Ramey* and *Hershkoff* were all right-to-vote cases which were analyzed under the strict scrutiny test

and that their analysis has yet to be applied in a reapportionment case. The state also relies upon Restatement (Second) of Conflicts §§ 12, 17 comment (d), 18 and 19 (1971). The state also advances five facts which distinguish the instant case from *Newburger* and *Ramey.* They are as follows. First, the military class came here under legal compulsion. Second, here the class stated that Alaska is not their home and that they do not vote here. Third, had there been a presumption of non-residence, as Carpenter claims, members of the class could individually have rebutted it by a simple anonymous declaration of either an Alaskan home or Alaska voter registration. Fourth, unlike the *Newburger* and *Ramey* situations, respondents to the military survey were not required to pledge to remain in Alaska for any period of time. Fifth, "whereas the objectionable criterian in *Newburger* and *Ramey* (intent to remain permanently) depressed voter registration, the criterion to which Carpenter objects (question 2) actually received the *highest* 'Alaska' response rate. Questions 1 and 3 together yielded a residency rate of 27 percent; questions 2 and 3 together yielded a residency rate of 31 percent."

We think resolution of the merits of the "indefinite intention" issue in the context of this litigation is highly debatable. As we mentioned previously, Carpenter made no showing that adoption of her position would have changed the composition of either the election district or the population base for purposes of reapportionment. Nevertheless, given the closeness of the question, we think it advisable that the Board, in the future, refrain from employing an "indefinite intention" factor in determining any reapportionment population base.

*shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socioeconomic area.* Each shall contain a population at least equal to the quotient obtained by dividing the total civilian population by forty. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible. (Emphasis added.)

Carpenter argues that District 2 is not compact and that Cordova is not socio-economically integrated with the Southeast coastal communities in the district.

*Groh v. Egan,* 526 P.2d 863, 866–67 (Alaska 1974), established the general standard of review to be applied by this court in exercising jurisdiction under Article VI, section 11.[23]

It cannot be said that what we may deem to be an unwise choice of any particular provision of a reapportionment plan from among several reasonable and constitutional alternatives constitutes "error" which would invoke the jurisdiction of the courts.

We view a plan promulgated under the constitutional authorization of the governor to reapportion the legislature in the same light as we would a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations. We have stated that we shall review such regulations first to insure that the agency has not exceeded the power delegated to it, and second to determine whether the regulation is reasonable and not arbitrary. Of course, additionally, we always have authority to review the constitutionality of the action taken, but we have stated that a court may not substitute its judgment as to the sagacity of a regulation for that of the administrative agency, and that the wis-

dom of a given regulation is not a subject for review.

The state argues that this court's role in reviewing apportionment plans is not to choose among alternative plans but rather to insure that the governor's plan is not arbitrary or unreasonable. Carpenter asserts that the court must also review the "constitutionality of the plan."[24] We think there is merit in both positions. In short, our review is meant to ensure that the reapportionment plan is not unreasonable and is constitutional under the provisions of Article VI, section 6 of Alaska's constitution.

Our state constitution mandates that election districts "contain as nearly as practicable a relatively integrated socio-economic area." Alaska Const., art., VI, § 6. The parties' initial dispute centers on the content of the socio-economic integration requirement. In its decision, the superior court stated:

The concept embodies a number of interrelated components, including economic base, ethnic composition, governmental boundaries, community size, transportation and communication links, and lifestyle. The reapportionment process requires a balancing of these components; one may be deemed predominant while another may be subordinated. . . .

Socio-economic integration does not require that regular social and economic interactions or transactions occur between the communities of a district, although such occurrences are indicia of socio-economic integration.

Carpenter contends this analysis is incorrect since it fails to require regular interaction between the communities of a district. She asserts that the superior court's "similarity of interest" test insufficiently emphasizes the need for intra-district interaction. The state characterizes redistricting as a

---

**23.** Alaska Const., art. VI, § 11, provides in part:

Application to compel correction of any error in redistricting must be filed within thirty days following the proclamation. Original jurisdiction in these matters is hereby vested in the superior court. *On appeal, the cause shall be reviewed by the supreme court upon the law and the facts.*

**24.** Carpenter cites *Acker v. Love,* 178 Colo. 175, 496 P.2d 75 (1972) (en banc).

balancing process and argues that communities with common economic bases and political interests may be joined, despite the lack of socio-economic interaction.

In *Groh v. Egan,* 526 P.2d 863, 878 (Alaska 1974), we looked to the Constitutional Convention minutes for a definition of the term "socio-economic area":

> Where people live together and work together and earn their living together, where people do that, they should be logically grouped that way.
>
> . . . .
>
> It cannot be defined with mathematical precision, but it is a definite term, and is susceptible of a definite interpretation. What it means is an economic unit inhabited by people. In other words, the stress is placed on the canton idea, a group of people living within a geographic unit, socio-economic, following if possible, similar economic pursuits. It has, as I say, no mathematically precise definition, but it has a definite meaning.

526 P.2d at 878, *quoting* Minutes, Constitutional Convention 1836, 1873. This description supports Carpenter's view that election districts were intended to be composed of economically and socially interactive people in a common geographic region.

In upholding the inclusion of Cordova in District 2, the superior court made the following findings: that the main economic base of Cordova and the Inside Passage communities is fishing; that fishermen in Cordova and the Southeast share many concerns such as port development, water quality, fisheries development, fish processing quality and safety, and forest management; that all the communities in District 2, except Haines and Skagway, are waterlocked ports with no overland connections to other principal communities; that Cordova and the Southeast communities share an interest in the development of the timber indus-

try; and that Cordova is a member of the Southeast Conference, a lobbying organization representing Southeast Alaska communities.

Carpenter does not dispute these findings; rather, she reiterates her argument that there is insufficient evidence of any social or economic interaction between the residents of Cordova and the other communities. Carpenter concedes their similarity of interest but contends that the economic and social activity in Cordova is completely separate from that of the Inside Passage communities. The state in turn concedes that Cordova is physically and economically segregated from the other communities in District 2. In this regard, Carpenter argues that Cordova is more closely integrated with the Prince William Sound communities due to their geographic and social interactions.[25]

Although the question is an extremely close one and our standard of review is deferential, we conclude that inclusion of Cordova in House Election District 2 violates the requirement in Article VI, section 6 of Alaska's constitution that "[e]ach new district so created *shall* be formed of contiguous and compact territory *containing as nearly as practicable a relatively integrated socio-economic* area." Alaska Const., art. VI, § 6 (emphasis added). The record is simply devoid of evidence of significant social and economic interaction between Cordova and the remaining communities comprising House Election District 2.

The superior court's judgment is AFFIRMED in Part and REVERSED in part as to the superior court's approval of the inclusion of Cordova in House Election District 2. The matter is remanded to the superior court to conduct such further proceedings and enter such further orders in accordance with this opinion as are deemed necessary to implement this opinion.

---

**25.** The superior court found various social and recreational connections between Cordova and Valdez including bowling tournaments, inter-scholastic sports competition and occasional social gatherings. In addition, there was evi-

## Appendix *

A study conducted by Dr. John A. Kruse of the Institute of Social and Economic Research of the University of Alaska (ISER) concluded that the only groups of potential non-residents present in the population in significant numbers were military personnel and their dependents. Dr. Kruse recommended a study be conducted of this group at seven (7) installations in the state, namely Fort Richardson and Elmendorf AFB in Anchorage, Fort Wainwright and Eielson AFB in Fairbanks, Fort Greely at Delta Junction, the Kodiak Coast Guard Station, and the Adak Naval Base.

Although the initial study of fish processing employees indicated significant numbers of non-residents in the Aleutians and Bristol Bay, Dr. Kruse recommended no survey be conducted of this group because of the anticipated difficulty in conducting such a survey, and because a substantial census bureau undercount of this work force was expected due to several factors:

a. lack of preparation by the census bureau created the likelihood that some fish processing units, many of which are mobile, floating units, would be missed by census enumerators or that groups within the units would be missed;

b. the census bureau was not able to obtain from the companies a list of employees with which it could organize the count and against which it could verify the coverage of the enumeration; a list is an essential tool in locating all the persons in a unit;

c. processing unit managers would, according to knowledgeable sources contacted by Dr. Kruse, be reluctant to permit disruptions of their operations to facilitate census enumeration;

d. the work shifts and group living and dining arrangements would complicate the task of identifying and interviewing each individual at a fish processing unit;

e. language barriers were expected to prevent a full and a complete enumeration;

f. low pay for census enumerators and the poor qualifications of persons employed as enumerators would reduce the chances that the enumerators would take the initiative to overcome these difficulties.

Fish processing workers who, in a box on the special census form provided them, gave a home address other than the fish processing unit were counted at that other address, be it in another state or another part of Alaska. The census forms given military servicemembers and other civilians (except lumber and oil base camp workers) lacked such a box; those persons were counted at those places where they were physically located.

It would not have been an acceptable demographic research technique to make deductions from such an unreliable census count; even if the numbers deducted were based on reliable research data, the result of the subtraction would contain all the inaccuracies of the census count.

Because of the likely census undercount, deduction of some non-resident proportion of the census population would work a double elimination: there would have been removed from the population base persons who had never been counted in the first instance.

Dr. Kruse, as part of a post-census study of census procedures, verified that all the problems anticipated with the census enumeration of fish processing workers did indeed occur.

Group quarters census data, which first became available four months after the Governor promulgated his reapportionment plan, verified Dr. Kruse's prediction of a substantial undercount of fish processing workers: whereas, 2,472 workers were reported to be employed and housed in group quarters on the Aleutian Chain and in Bristol Bay, the census bureau counted only 760.

The means by which the Governor might have surveyed fish processing workers to determine the number of non-residents

dence of some intervisitation between Cordova and Valdez via air mail and ferry transport.

* This appendix is taken from the superior court's findings of fact and conclusions of law.

presented substantial difficulties that would have undermined the reliability of the results. The same problems applied to lumber workers, making any survey of lumber workers difficult and the results unreliable.

There were no other readily-identifiable groups with numbers and concentrations of residency characteristics that would influence Alaska's legislative apportionment, except the military.

The Governor deducted from the reapportionment population base those numbers of non-resident military personnel and dependents who resided at or near the seven largest military installations in Alaska, after surveying a scientific sample of the personnel at those seven sites. It was recommended that all of the military installations be surveyed because it was determined that there were not significant numbers of military personnel and their dependents at installations other than the seven selected.

There were approximately 2,067 non-resident military personnel at smaller installations on the Aleutians, in Bristol Bay, in interior Alaska and in Southeast Alaska. The largest numbers of non-residents were at Shemya and King Salmon in District 26 (851), Galena in District 24 (259), Juneau (195), Sitka (137), Ketchikan (133) and Clear in District 17 (100).

Had all these numbers of non-resident military, and those at other locations not listed in the preceding paragraph, been deducted from the population base, that population base would have become 367,050 and the ideal district size would have become 9,176. . . .

Under this scheme, the most overpopulated district would be District 25 with 9,684 persons ( + 5.53%); the most underpopulated district would be District 26 with 8,628 persons (–5.97%); and the combined variation from the ideal district size would be 11.50%. . . .

Military personnel are compelled, under penalty of military discipline or criminal liability, to live in Alaska. Most military personnel and their dependents live on self-contained, insular reservations.

Civilians and their dependents vote at a rate 5.6 times greater than military personnel and dependents. In the 1980 general election in Alaska, which included the election of the President of the United States, voter turnout in civilian precincts as a proportion of total population was approximately 45%. In military precincts the comparable figure was 8%.

The proportion of military claiming Alaska to be their home was calculated from responses to three questions: First, "Do you consider your home to be in Alaska or some other state?" Second, "Do you plan to make your home in Alaska or some other state when you leave the military?" Third, "Are you registered to vote in the State of Alaska?" Persons who answered "Alaska" to the first two questions, or who were registered voters, were counted as Alaska residents, yielding an average residency factor of 25%.

.     .     .     .     .

Because of the formidable difficulties in making an accurate count of fish processing and lumber workers, and because of the likelihood of a census undercount and reallocation of many of those workers, it was constitutionally permissible to exclude identifiable non-resident military personnel and dependents from the reapportionment population base while including non-identifiable members of other groups. The only alternative was to do a technically problematic survey with the real possibility of a double elimination of non-residents. The Governor was justified in deciding this alternative might well have placed a greater burden on the protected activity.

Because of the difficulty of access to remote military sites, many of which are tightly secured intelligence posts, and because of the wide dispersal and relatively small size of these remote sites, it was constitutionally permissible for the Governor to forego study of the military at these remote sites. However, because the consistency of results of the surveys done at larger installations made it feasible to apply these results to the smaller installations, such a course of action would have been less

restrictive than including all the military at remote sites in the population as the Governor did. The non-resident population of the smaller sites should therefore have been calculated on the basis of available survey data and excluded from the population base. Analysis of the population figures shows that such a procedure would materially affect only District 26. . . . Because the deviation from ideal district sizes would exceed 10% once the formula was applied to the remote sites, and because the Governor has demonstrated no rational basis for the variations in Districts 25 and 26, an adjustment must be made to balance the sizes of the two districts and bring them within the constitutionally permissible deviations from the ideal district size. *Groh v. Egan,* 526 P.2d at 882. The court suggests that such an adjustment could be made by simply including Platinum (population 55) and Goodnews Bay (population 168) within District 26.

MATTHEWS, Justice, concurring.

I am in complete agreement with the majority opinion. I write separately to make several observations concerning the conclusion that Cordova may not be included in District 2.

*First.* The primary error of the reapportionment board was to equate socio-economic integration with socio-economic homogeneity. In the reapportionment plan the board consistently refers to the integration requirement as one of homogeneity.[1] The concepts are by no means synonymous. Integration connotes interaction and connectedness, while homogeneity refers to similarity or uniformity. Webster's Third New International Dictionary 1085, 1174 (1965). Thus, while it is possible to say that Cordova, a town which is economically dependent

on commercial fishing, is in a sense homogeneous with the commercial fishing towns on Prince of Wales Island in southeastern Alaska, 700 miles and two time zones away, it is in no sense correct to say that Cordova is integrated with those communities. By contrast, a fishing community may not be homogeneous with a neighboring community having a different economic base, but the two can be considered to be integrated because of trade, transportation, and social links.[2]

*Second.* The compactness requirement of article VI, section 6 of the Alaska Constitution also mandates the conclusion that Cordova may not be included in District 2.

Article VI, section 6 provides that each new election district

shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.

"Compact" in the sense used here means having a small perimeter in relation to the area encompassed. Black's Law Dictionary 351 (4th ed. 1968). The most compact shape is a circle. Since it is not possible to divide Alaska into circles, it is obvious that the constitution calls only for relative compactness. But this does not mean that the compactness requirement is without substantive content. Where there are two or more districts in a given area they can be compared on compactness grounds with other possible districts encompassing the same area.[3] A New Jersey court has stated:

Although the impact of the compactness directive cannot be precisely stated, we believe that the word itself can be given meaningful content. *Webster's Third New International Dictionary*

---

1. The plan has two sections discussing the requirements of art. VI, § 6 of the Alaska Constitution. The first is appropriately titled "Compactness and Contiguity;" the second is inappropriately, but revealingly, titled "Socio-Economic Homogeneity." Reapportionment Plan at 13–14.

2. In political theory terms homogeneity may be a distinctly undesirable basis on which to draw district lines, for the representative of a stable

majority interest group has no need to listen to other views. Note, Political Gerrymandering: A Statutory Compactness Standard as an Antidote for Judicial Impotence, 41 U.Chi.L.Rev. 398, 400–404, 414–415 (1974).

3. *See* Schwartzburg, Reapportionment, Gerrymanders, and the Notion of "Compactness," 50 Minn.L.Rev. 443–446 (1966).

(1966) defines "compact" as "marked by concentration in a limited area." Technically, we interpret the requirement of compactness to mean that between two districts of equal area the one with the smaller perimeter is the more compact. A somewhat similar idea was projected by counsel for the Apportionment Commission at the oral argument—that the objective of compactness could be determined by drawing a circle around each of the proposed districts. Those districts which occupy relatively greater areas within the circle could be said to be more compact. . . .

We recognize that the constitutional mandate to draw districts equal in their number of inhabitants may conflict with the mandate for compactness and 'that the former is paramount. Compactness is undoubtedly a material factor, however, when the choice of districting plans includes one yielding bizarre designs. . . . This is particularly so where compact districts may be drawn with a minimal increase in population deviation.

*Davenport v. Apportionment Commission of the State of New Jersey*, 124 N.J.Super. 30, 304 A.2d 736, 743 (App.Div.1973) (citations omitted), *modified*, 63 N.J. 433, 308 A.2d 3 (1973), *aff'd* 65 N.J. 125, 319 A.2d 718 (1974).

In no sense is District 2 compact. It runs some 700 miles from its southeasternmost to its northwesternmost points. It is shaped roughly like two extended arms, each with a shoulder, connected in the middle not by a head and torso, but by a narrow ligament which threads its way between Districts 3 and 4. The impossibility of considering District 2 to be relatively compact is evident merely from looking at the map.[4]

*Third.* Southeastern Alaska, a distinct geographical region of this state, will sustain six seats in the House of Representatives without making an extended reach into southcentral Alaska to include Cordova. This court has twice held that stretching a southeastern election district to include Cordova would violate the compactness requirement.

In *Egan v. Hammond,* 502 P.2d 856 (Alaska 1972) the master's report observed the following with respect to the possibility of the inclusion of Cordova in a southeastern district in order to cure the overrepresentation in the Ketchikan District:

It is not feasible to reach beyond the southeast region because of the clear separation of the region from the balance of Alaska (the air miles from the northwestern-most population in the region at Yakutat to the nearest population in southcentral region, Cordova, is 225 miles).

*Id.* at 892. This court, in adopting the master's plan, came to the same conclusion, stating:

The Ketchikan House and Senate districts vary from the norms by −22.5%. Within the time available the Court was unable to reduce substantially this variance and still meet the mandate of the Alaska Constitution requiring a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. A more extensive explanation of the variance is available in the Master's Report (pages 892 through 897, supra).

*Id.* at 928 n. 2.

In *Groh v. Egan,* 526 P.2d 863 (Alaska 1974), we concluded that the State had justified a population deviation of greater than 10% with respect to two southeastern Alaska districts on the grounds that the only alternative thereto would be extending a southeastern district to include Cordova. We stated:

With reference to the Juneau and Wrangell-Petersburg areas, the Board was confronted with the difficult problem of juggling the more contiguous, compact, relatively integrated socio-economic areas of Southeast Alaska without extending a substantial distance into an unrelated area separated by immense natural barriers. Yakutat, the northwestern-most settlement in Southeast Alaska, which is

---

**4.** *See* Appendix.

itself separated by great distance from the other communities in the region, is 225 air miles from the nearest population center in the Southcentral region, Cordova. There are valid considerations both historically and geographically for not endeavoring to span that gap.

*Id.* at 879.

Currently there is no better reason than there was in 1972 or 1974 for including Cordova in a southeastern Alaska district because, as previously noted, southeastern Alaska taken alone is entitled to its present six members in the House of Representatives.

*Fourth.* It is useful for illustrative purposes to refer to Justice Compton's assumption that some part of suburban Juneau might be taken from District 4 and added to District 2.[5] Justice Compton points out that this new district would not be "more socio-economically integrated than the area produced by linking Cordova with the southeast communities of Yakutat and Haines." Although I believe that this conclusion is clearly wrong for the reasons stated by the majority opinion, and because Juneau and Haines have been in the same house district for many years,[6] let us assume that it is true. The new district thus

created would necessarily be constitutionally preferred to the existing district because while both districts would be rated as equal in terms of socio-economic integration, the new district would be superior to the existing district in terms of compactness.[7] The same conclusion can be drawn with respect to any logical alternative method of districting southeastern Alaska.

*Fifth.* In a broad sense gerrymandering is dividing an area into political units in an unnatural way with the purpose of bestowing advantages on some and thus disadvantaging others. *See* Webster's Third New International Dictionary 952 (1966). The compactness and integration requirements were designed to prevent gerrymandering.[8] The intent to gerrymander may be very difficult to prove, especially if the objective was one other than to benefit the political party in power.[9] However, if the compactness and integration requirements are observed, the opportunities to gerrymander are quite limited. It is therefore preferable both on constitutional and practical grounds to insist on the observation of those requirements rather than to require, as Justice Compton would, proof of an intent to gerrymander as a prerequisite to a finding of a constitutional violation.

---

**5.** By using this example I do not mean to imply that such an adjustment would necessarily reflect a logical, or constitutional, apportionment.

**6.** Indeed we noted in *Groh v. Egan* the close ties between Juneau and Haines:

> The Board, however, presented a rational basis for not severing Skagway and Haines from the [Juneau] district, ... There are close transportation ties between Juneau, Haines and Skagway by daily scheduled air flights and frequent ferry service; a Juneau-Haines highway connection has been planned. The district is quite distinct from the rest of the Southeast region by virtue of the nature of its development and the fact that it is almost entirely composed of portions of the mainland, rather than the islands of the archipelago; historically the three communities have always been closely linked, with Juneau serving as an economic hub for Haines and Skagway.

526 P.2d at 879.

**7.** This conclusion is based on the assumption that the goals of compactness and socio-economic integration stand on an equal footing in our constitution. At least as a textual matter, compactness seems to have priority, for the constitution commands first that each district be contiguous and compact and then, in selecting among possible contiguous and compact districts, those containing as nearly as practicable a relatively integrated socio-economic area are to be preferred. Further, the compactness requirement is not modified by "as nearly as practicable" or "relatively" while the requirement of socio-economic integration is.

**8.** 3 Proceedings of the Alaska Constitutional Convention 1846 (Jan. 11, 1956).

**9.** *See* Note, Political Gerrymandering: A Statutory Compactness Standard as an Antedote for Judicial Impotence, 41 U.Chi.L.Rev. at 406–411 (1974).

APPENDIX

COMPTON, Justice, joined by BURKE, Chief Justice, dissenting in part.

Although I concur for the most part with the court's opinion, I dissent from the conclusion reached in Part IV that the inclusion of Cordova in District 2 violates the requirement that each new district be "as nearly as practicable a relatively integrated socio-economic area." Alaska Const. art. IV, § 6. The court fails to acknowledge the flexibility of these constitutional guidelines. In addition, the court's conclusion does not explain what Cordova's fate is to be, now that it has been extracted from District 2. Since the difficult choice of placing it there was made by a reapportionment board that considered likely alternatives, this court should defer to its judgment on such a close question and affirm the superior court's holding.

A "*relatively* integrated socio-economic area" is not the same as an integrated socio-economic area. The Board is not required to find perfectly integrated areas on which to base its election districts; it is permitted by the constitutional language to consider the relative economic integration of various areas and to fashion the election districts according to its judgment. One of Carpenter's own exhibits states that "[f]from the economic perspective, Cordova is closer to Seattle and Tokyo than it is to Valdez." If the alternative is Tokyo, then it seems relatively reasonable to include Cordova with the other waterlocked fishing communities in District 2 that share similar interests.

Furthermore, while the constitutional requirements for reapportionment were designed to prevent rotten boroughs,[1] Carpenter did not argue that the Board included Cordova in District 2 for political reasons, and she presented no evidence of gerrymandering. According to the authors of article VI, section 6, the clause concerning integrated socio-economic areas "prohibits gerrymandering .... [T]he Committee feels that gerrymandering is definitely prevented by these restrictive limits."[2] In the absence of evidence that the Board manipulated the District to create improper political advantages, there is no showing that the Board frustrated the intent of the Constitution's framers, and therefore no showing that the Board exceeded its constitutional authority.

Given the acknowledged closeness of the question, (Majority Opinion, 667 P.2d at 1215), it is inappropriate for this court to substitute its judgment for that of the Board. The court's role is not "to decide what is preferable between alternative rational plans." *Groh v. Egan,* 526 P.2d 863, 866 (Alaska 1974). Rather, if the choice made by the Board was reasonable and within constitutional limits, this court should defer to the Board's expertise. *Id.*

The inclusion of Cordova in District 2 is within constitutional limits because election districts need only be "as nearly as practicable" relatively integrated socio-economic areas. Alaska Const. art. IV, § 6. Like the standard of *relative* integration, the practicability standard allows the Board to be flexible in drawing its lines. Together, these standards give the Board wide discretion in creating election districts.

In addition, I believe that the practicability standard applies to more than how practicable a certain degree of socio-economic integration may be. The Board must also consider the practicability of integrated districts from the standpoint of other constraints on election districts. The Board is required by both the Alaska Constitution and the mandate of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to create districts with equal populations. This requirement should be viewed

---

1. A rotten borough originally referred to a voting district in England which had become depopulated over the years but still had the power to elect a Parliamentary representative. The term has come to mean any political subdivision in a republic with more than its fair share of representation. For a discussion of rotten boroughs and their effect on representative government, see *Baker v. Carr,* 369 U.S. 186, 302–07, 82 S.Ct. 691, 756–759, 7 L.Ed.2d 663, 735–38 (1962) (Frankfurter, J., dissenting).

2. 3 Alaska Legislative Council, Alaska Constitutional Convention 1846 (1965).

as a practicable limit on the Board's ability to designate economically integrated districts. Just as the Board cannot arbitrarily divide the state into equipopulous districts without regard to relative economic integration, it also cannot create a district based solely on socio-economic criteria without considering the effect such a district will have on the requirement of equal numbers within districts.

The effect of creating one district with a population unequal to that of the other districts is to throw off the entire reapportionment scheme. By removing Cordova from District 2, the court does just that. The population shortfall in District 2 will presumably be made up by borrowing from the present District 4. The testimony at trial suggested that this might be accomplished by separating the north end of Juneau or the island of Douglas from the rest of Juneau, and adding the population of that area to District 2.

The district created by this "solution" is not any more socio-economically integrated than the area produced by linking Cordova with the southeast communities of Yakutat and Haines. The economy of Juneau relies on government, not fishing or logging. The Board considered this alternative to the present District 2, and rejected it. The Board also considered the relative socio-economic integration of District 2, and decided that while Cordova was indisputably physically closer to Valdez, "from a socio-economic standpoint, Cordova has less in common with the predominantly commercialized and industrialized economies of Seward and Valdez than with the fishing communities of the Inside Passage." [3]

The Board's judgment on these matters should not be taken lightly. As the standard of review in *Groh v. Egan,* 526 P.2d at 866, suggests, this court should not feel free to choose between the same alternatives that the Board has already considered merely because it does not like the Board's conclusions. I would therefore accept the

Board's reapportionment plan and affirm the superior court's decision.

---

3. The Reapportionment Board, Reapportionment and Redistricting Plan for the Alaska State Legislature, 13–14 (1981).