813 A.2d 1264 (2003)
357 N.J. Super. 74
Anne M. McNEIL, Thomas E. Williams, Roseanna Siebert, Paul Digaetano, and Kevin O'Toole, Plaintiffs-Appellants,
v.
The LEGISLATIVE APPORTIOMENT COMMISSION OF the STATE of New Jersey, Defendant-Respondent,
Regena L. THOMAS, Secretary of State of New Jersey, and David Samson, Attorney General of New Jersey,[1] Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 2002.
Decided January 22, 2003.
*1265 Kevin B. Riordan, Toms River, argued the cause for appellants (Berry, Sahradnik, Kotzas, Riordan & Benson, attorneys; Mr. Riordan, of counsel and on the brief).
Steven Siegel, Hackensack, argued the cause for respondents (Sokol, Behot & Fiorenzo and Scarinci & Hollenbeck, attorneys; Leon J. Sokol and Robert E. Levy, of counsel; Mr. Siegel and Nomi I. Lowy, on the brief).
Donna Kelly, Senior Deputy Attorney General, argued the cause as amicus curiae (David Samson, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Ms. Kelly, and Loretta E. Lonergan, Deputy Attorney General, on the brief).
Before Judges PETRELLA, LINTNER and PARKER.
The opinion of the court was delivered by
PETRELLA, P.J.A.D.
Anne M. McNeil of Jersey City, Thomas E. Williams of Newark, Roseanna Siebert of the Borough of Bergenfield, Paul Di-Gaetano of Nutley, and Kevin O'Toole of the Township of Cedar Grove (collectively, plaintiffs) appeal from entry of summary judgment dismissing their complaint that contested the legislative districting plan certified on April 11, 2001 (the 2001 plan) by six of the eleven members of the New Jersey Legislative Apportionment Commission (Commission). Plaintiffs DiGaetano and O'Toole were incumbent legislators, both of whom won re-election under the 2001 plan.
The process for creating the 2001 plan began pursuant to Article IV, section 3, paragraph 1 of the New Jersey State Constitution (Constitution), which provides for appointment of an Apportionment Commission consisting of ten members, five from each of the two major political parties, which shall meet and apportion the State legislative districts during the year following the decennial census of the United States. The districts are to be certified by February 1 in the year after the census is taken, or within one month of the Governor's receipt of the census results, whichever is later. If the Commission fails to meet the deadline, or determines before that date that it will fail, the *1266 Constitution requires the Chief Justice of our Supreme Court to appoint an eleventh member of the Commission who would break any tie vote. The districts are to be certified within one month of that member's appointment. N.J. Const. art. IV, §3,¶2.
A deadlock developed among the tenmember Commission composed of equal members of the two major political parties.[2] Pursuant to the Constitution's requirement, the Chief Justice appointed Larry Bartels, a university professor, as an eleventh member to the Commission. He was neither registered to vote in any election in this State nor affiliated with any political party.
Following the March 27, 2001 appointment of Bartels as the Commission's eleventh member, the deadlock was broken when the five Democratic members of the Commission agreed to the version of the 2001 plan approved by Bartels. Thus, on April 11, 2001, a six-member majority of the eleven-member Commission voted to certify the 2001 plan, which was forwarded to the Secretary of State the next day. On April 17, 2001, those same members of the Commission submitted to the Secretary of State an amended certified 2001 plan, correcting certain technical errors to the plan as it had been submitted.
On May 9, 2001, plaintiffs filed their original four-count complaint in this matter in the Law Division, Mercer County. They named as defendants the Commission, the then Secretary of State of New Jersey and the then Attorney General of New Jersey. On the same day, they filed an amendment to the complaint, asserting that the redistricting plan as adopted expressed a bias against incumbent legislators. Plaintiffs also sought an order to show cause seeking temporary restraints, which the motion judge denied. Leave to appeal that denial was also denied.
The Commission filed a motion for summary judgment with supporting papers. Plaintiffs cross-moved for summary judgment on counts one and two of their complaint, the counts that asserted, respectively, that Jersey City and Newark inappropriately were divided among too many legislative districts.
By an October 12, 2001 order, the motion judge granted defendant's motion for summary judgment and denied plaintiffs' motion for summary judgment. Plaintiffs' claims were dismissed with prejudice. Plaintiffs filed a timely notice of appeal.
Plaintiffs contend that the judge on the motion hearing erred in upholding the 2001 plan because the Commission failed to honor Article IV, section 2, paragraph 3 of the Constitution. Plaintiffs rely on the specific provision in that paragraph that "no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by onefortieth of the total number of inhabitants of the State." Applying this provision (the "municipality districting standard") to municipalities, as of the 2000 census, Newark and Jersey City each should have been divided into only two legislative districts. However, under the 2001 plan they were each divided into three districts. Other issues raised in the complaint were abandoned.
A companion appeal in Charles Steelman et al. v. The Legislative Apportionment Comm'n, A-182-01T1, was argued the same date as this appeal and is being *1267 separately decided. Among other issues, the plaintiffs in that appeal challenged Atlantic County's subdivision among three legislative districts, relying upon the same constitutional language quoted above as it pertained to counties (a county districting standard). The restriction on dividing municipalities was not implicated or applicable in that matter.
As amended effective December 8, 1966, Article IV, section 2 of the New Jersey Constitution provides as follows:
1. The Senate shall be composed of forty senators apportioned among Senate districts as nearly as may be according to the number of their inhabitants as reported in the last preceding decennial census of the United States and according to the method of equal proportions. Each Senate district shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties.
2. Each senator shall be elected by the legally qualified voters of the Senate district, except that if the Senate district is composed of two or more counties and two senators are apportioned to the district, one senator shall be elected by the legally qualified voters of each Assembly district .... [omitting provision about when senators' terms begin and end].
3. The General Assembly shall be composed of eighty members. Each Senate district to which only one senator is apportioned shall constitute an Assembly district. Each of the remaining Senate districts shall be divided into Assembly districts equal in number to the number of senators apportioned to the Senate district. The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported in the last preceding decennial census of the United States. Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State.
[N.J. Const. Art. 4, § 2, ¶¶ 1-3.]
The final sentence of paragraph 3 above contains the municipality districting standard at issue here.
According to the 2000 census figures, New Jersey's total population was 8,414,-350. One fortieth of that figure was 210,-359, which is considered the ideal population or goal for each of New Jersey's forty legislative districts. Jersey City's population was 240,055, exceeding the ideal district population by 29,696. Newark's population was 273,546, exceeding the ideal district population by 63,187.
As conveyed to the then Secretary of State on April 12, the 2001 plan included a "Plan Components Report" showing a district-by-district listing of municipalities, the populations of each municipality, subtotaled by municipality and county within each district, and subtotaled for the whole district. Next to each district, county, and municipality population figure is a listing of the number of individuals purporting to be (1) "NH Blk" (non-Hispanic *1268 Black) and (2) Hispanic origin.[3] The recertified corrected pages of the plan included pages showing each district's population, the ideal district population figure of 210,359, each district's deviation from the ideal, and percentages of each district's and municipality's members of minority groups, including component percentages for "non-Hisp African-American" and Hispanic populations.
The 2001 plan subdivided Jersey City and Newark each into three legislative districts. Parts of Newark were included in the 27th, 28th, and 29th Districts. The 27th District included: Caldwell, Orange, Essex Fells, Fairfield, Livingston, Maplewood, North Caldwell, Roseland, South Orange, West Caldwell, West Orange, and Newark's West ward voting districts numbers 27 through 29, 33, 35 through 41, and 45. The district's population of 206,390 was 3,969 less than the ideal district population. The Commission calculated that 44.8% of the district's residents were members of minority groups, including 29.6% (61,110) African-American and 6.8% (14,-239) Hispanic residents. There were 19,-641 Newark residents in the 27th District, including 14,599 African-American and 1,632 Hispanic residents.
The 28th District included: Belleville, Bloomfield, Irvington, and voting districts from parts of Newark's North, South, Central and West wards. The district's population of 217,596 was 7,237 more than the ideal district population. The Commission's figures indicated that 73.5% of the district's residents were members of minority groups, including 51.1% (111,386) African-American and 15% (32,645) Hispanic residents. There were 73,290 Newark residents in the 28th District, including 55,494 African-American and 12,151 Hispanic residents.
The 29th District included: Hillside (in Union County), and voting districts from parts of Newark's North, South, Central and East wards. The district's population of 202,362 was 7,997 less than the ideal district population. The Commission calculated that 79.8% of the district's residents were members of minority groups, including 40.4% (81,951) African-American and 34.5% (69,992) Hispanic residents. There were 180,615 Newark residents in the 29th District, including 71,990 African-American and 66,839 Hispanic residents.
Parts of Jersey City were included in the 31st, 32nd, and 33rd Districts. The 31st District included: all of Bayonne, and in Jersey City, all of the municipal voting districts within ward A, and parts of wards B, C, E and F. The district's population of 207,327 was 3,032 less than the ideal district population. The Commission's figures indicated that 66.0% of the district's residents were members of minority groups, including 28.1% (58,417) African-American and 21.7% (45,120) Hispanic residents. There were 145,485 Jersey City residents in the 31st District, including 55,319 African-American and 34,105 Hispanic residents.
The 32nd District included: Fairview (in Bergen County), East Newark, Harrison, Kearny, North Bergen, and Secaucus (in Hudson County), plus in Jersey City, parts of wards B, C, and D. The district's population of 208,227 was 2,132 less than the ideal district population. The Commission's figures indicated that 57.8% of the district's residents were members of minority groups, including 4.5% (9,401) African-American and 39.8% (83,054) Hispanic residents. There were 63,635 Jersey City *1269 residents in the 32nd District, including 6,138 African-American and 25,392 Hispanic residents.
The 33rd District included: Guttenberg, Hoboken, Union City, Weehawken, West New York, plus in Jersey City, parts of wards C and E. The district's population of 206,676 was 3,683 less than the ideal district population.[4] The Commission's numbers indicated that 68.9% of the district's residents were members of minority groups, including 3% (6,383) African-American and 57.5% (118,860) Hispanic residents. There were 30,935 Jersey City residents in the 33rd District, including 2,932 African-American and 8,455 Hispanic residents.
The corrected 2001 plan indicated the prior legislative districts to which each municipality in these districts had been assigned. It also included subtotals of population numbers and minority percentages for each of the prior districts from which the new district's residents had been reassigned.
Plaintiffs alleged in their complaint that under the population pattern of the current census data, the fragmentation of Jersey City and Newark into three legislative districts each was neither warranted nor justified by any requirement of federal or state law, and was in direct contravention of the municipality districting standard in Article IV, section 2, paragraph 3 of the Constitution. They also alleged that "[n]umerous alternative apportionment plans can be, and have been, prepared" that would meet the federal and state law provisions without unnecessarily breaking up either Jersey City or Newark into more districts than are required under our State Constitution's municipality districting standard. Plaintiffs' brief asserts that they "submitted to the trial court an apportionment plan that properly divides the municipalities of Jersey City and Newark" and that their plan violates neither the Federal nor State Constitutions.[5]
Summaries of the New Jersey legislative districts created since 1967 indicate that Jersey City and Newark had been divided into three districts each under plans certified in 1967, 1969, 1981 and 1991. In addition, in 1971 there were two districts for Jersey City and three for Newark, and in 1973, three districts for Jersey City and four for Newark.
In an October 1, 2001, opinion, the motion judge held that plaintiffs failed to show that the 2001 plan included "invidious discrimination or other constitutional deficiency." The judge discussed the case law construing Article IV, section 2, paragraph 3, particularly Scrimminger v. Sherwin, 60 N.J. 483, 291 A.2d 134 (1972), and Davenport v. Apportionment Comm'n, 65 N.J. 125, 319 A.2d 718 (1974) (Davenport II), where Senate districting plans were developed *1270 without adhering to the county-line provision of the State Constitution. The judge extrapolated:
It thus logically follows that the Scrimminger Court, in abrogating the county-line provision of Article 4, Section 2, Paragraph 3, also abrogated the portion of Paragraph 3 governing the division of larger municipalities. The very structure and language of the Scrimminger decision leads to this conclusion. In the same paragraph in which the Scrimminger Court enunciated its holding that "the county cannot now serve as the basis of districting ..." the Court stated, "[t]he boundaries of the larger municipalities will of course have to be breached, and in this regard, the Commission may have to depart from the direction of Art. 4, Section II, Paragraph 3, concerning the division of a municipality." Scrimminger, 60 N.J. at 498, 291 A.2d 134 (emphasis added). This provision, like the county-line provision, thus ceases to have any viability in New Jersey's reapportionment scheme.
The court found nothing in Scrimminger or Davenport to prevent a reapportionment commission, "in an effort to satisfy the paramount concern of population equality and the myriad of other important statutory and constitutional requirements," from "dividing a larger municipality into more than two districts." The judge noted that aside from the allegation that Jersey City and Newark were divided into too many districts, plaintiffs did not allege or prove any constitutional or other infirmities of the 2001 plan. The judge felt that the 2001 plan met the paramount consideration of population equality, satisfied requirements of contiguity and compactness, adhered to the boundary lines of smaller municipalities, and was not tainted with invidious discrimination or other legal infirmities.
The judge noted that in the four legislative districting plans approved since the New Jersey Constitution's amendment in 1966, Newark and Jersey City had been divided into more than two legislative districts and those plans were nonetheless approved despite dividing Newark and Jersey City into more than two legislative districts. The judge rejected plaintiffs' assertion that no court had ever specifically addressed the question of dividing Newark and Jersey City each into more than two legislative districts. The judge quoted from the decisions in the Davenport litigation, noting first the Appellate Division opinion "[t]he Commission followed the Scrimminger directive to use municipalities as building blocks, with necessary exceptions in the case of Newark and Jersey City." Davenport v. Apportionment Comm'n, 124 N.J.Super. 30, 42, 304 A.2d 736 (App.Div.1973), aff'd, 65 N.J. 125, 319 A.2d 718 (1974). Affirming that districting plan, the Supreme Court concluded "that the Commission plan adequately carries out the mandate of Scrimminger and has not been shown to be in violation of any State or Federal constitutional standards." Davenport II, supra (65 N.J. at 135, 319 A.2d 718). The motion judge here thus concluded that "[t]his language makes it abundantly clear that the Court considered the division of Newark and Jersey City into more than two legislative districts."
The judge indicated that while the courts have held that Newark and Jersey City were "`necessary exceptions' from the Article IV, Section 2, Paragraph 3 prohibition on dividing municipalities into multiple legislative districts, they have never suggested that the division of smaller municipalities is appropriate." Accordingly, the judge interpreted those cases "as abrogating Article IV, Section 2, Paragraph 3 only in reference to municipalities with populations exceeding onefortieth *1271 of the State's total number of inhabitants." The judge explained:
Scrimminger does not provide the reapportionment commission with unbridled discretion to divide municipalities regardless of their population, as it recognized that as a general rule, municipalities are appropriate "building blocks" for the creation of legislative districts. It is only when a municipality's size makes it a "necessary exception" that the commission is warranted in dividing the municipality into more than one legislative district.
Plaintiffs contend that because the plan violated the municipality districting standard their challenge to the 2001 plan should not have been dismissed, and the motion judge erroneously held that the constitutional provision setting forth that standard had been impermissibly abrogated.
The judge's reasoning that our State Constitution's municipality districting standard was abrogated does not withstand scrutiny. As noted, plaintiffs contend that their challenge to the 2001 plan should not have been dismissed because the plan violated the municipality districting standard in Article IV, section 2, paragraph 3 of the Constitution. The judge observed that the language of the municipality districting standard would limit dividing Jersey City and Newark into no more than two legislative districts, so plaintiffs met their burden of proving that the plan suffered from "constitutional deficiencies" because it divided each of those cities into three districts. The judge erred in concluding that the Constitution's municipality districting standard provision was abrogated. No case has heretofore addressed the issue of dividing municipalities contrary to that standard. The Scrimminger holding, that districting along county lines could not be accomplished without violating federal population equality standards, did not compel a conclusion that the municipality districting standard was abrogated. The Scrimminger dicta that the Commission "may have to depart from" the municipality districting standard meant that the standard could be ignored only when necessary to satisfy a paramount federal constitutional obligation.
As this matter was decided on summary judgment motions, the motion judge was required to "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, [were] sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the nonmoving party." Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995). Our standard of review as an appellate court mirrors that in the trial court: whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law. Kopin v. Orange Products, Inc., 297 N.J.Super. 353, 366, 688 A.2d 130 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997); McClelland v. Tucker, 273 N.J.Super. 410, 415, 642 A.2d 409 (App.Div.1994).
The judicial role in reviewing the validity of a legislative districting plan is limited. Davenport II, supra (65 N.J. at 135, 319 A.2d 718). "Reapportionment is essentially a political and legislative process." Ibid. Accordingly, a redistricting plan "must be accorded a presumption of legality with judicial intervention warranted only if some positive showing of invidious discrimination or other constitutional deficiency is made. The judiciary is not justified in striking down a plan, otherwise valid, because a `better' one, in its opinion, could be drawn." Ibid. (citing Gaffney v. *1272 Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)).
A central concept of the provisions of Article IV, § 2, ¶¶ 1-3 of our State Constitution is that "the Senate districts shall consist of one or more whole counties, whereas the Assembly districts shall be portions of a Senate district except where only one Senator is to be elected in the Senate district, in which event the Senate district and the Assembly district are coterminous." Davenport v. Apportionment Comm'n, 63 N.J. 433, 435, 308 A.2d 3 (1973) (Davenport I). Case law that followed enactment of the foregoing provisions resulted in significant changes to the way New Jersey's legislative districts are created using counties as building blocks. Thus, Jackman v. Bodine, 49 N.J. 406, 414-415, 231 A.2d 193 (1967), held that an alternative proposal that improved population equality ratios in the State's six southern counties by about 7% to 10% must be followed, even though that alternative required Gloucester County to be divided among two districts, which the county districting standard of Article IV, section 2, paragraph 3 prohibited unless necessary to meet contiguity, compactness, or population equality requirements. That decision also held that "notwithstanding the provisions of our State Constitution, the 80 Assemblymen must be apportioned among the Senate districts according to the equalproportions method and without reference to the apportionment of the Senators." Id. at 417, 231 A.2d 193.
The Court's 1972 Scrimminger opinion was its "eleventh opinion dealing with apportionment under the one-man, one-vote doctrine" promulgated by Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Scrimminger, supra (60 N.J. at 484-485, 291 A.2d 134). After reviewing Article IV, section 2's diverse methods for electing Senators, Scrimminger observed that the "command for adherence to county lines" generated the issue of population inequality before it, and that the difficulty arose because there were twenty-one counties with substantial differences in population. Id. at 486-487, 291 A.2d 134.
In attempting to strike a balance between population equality and county line mandates, the Commission created a plan where the ranges of deviations from the ideal district were 28.83% for the Senate districts and 26.20% for the Assembly districts. Id. at 489, 291 A.2d 134. Scrimminger said that deviations of that magnitude were "invalid notwithstanding the stated purpose of the apportionment (i.e., to adhere to county lines), and even though that purpose could not be satisfied by another arrangement involving lesser deviations." Id. at 493, 291 A.2d 134. Accordingly, Scrimminger held that the plan presented was invalid, and that "the mandate of our State Constitution with respect to adherence to county lines" could not be enforced "under the demographic pattern revealed by the 1970 census." Id. at 495, 291 A.2d 134. The Court added that "[s]ince the county cannot now serve as the basis of districting and since the multimember district is contemplated in the Constitution only as an incident of county representation," Senate districts had to be single-member districts. Id. at 497, 291 A.2d 134.
However, Scrimminger continued: "[m]unicipal lines should be observed, if possible, for if they are followed, dividends may be expected in terms of furthering the relationship of these political subdivisions and the State and also in terms of restraining to some extent the opportunities for drawing lines for partisan advantage." Id. at 497-498, 291 A.2d 134. Thus, the Court held: "[m]unicipalities are thus appropriate building blocks for the *1273 creation of districts. The boundaries of the larger municipalities will of course have to be breached, and in this regard, the Commission may have to depart from the direction in Art. 4, § II, ¶ 3, concerning the division of a municipality." Id. at 479, 291 A.2d 134. The Court added that although the requirements for contiguity and compactness would remain effective, compactness "may be of limited utility in the light of the odd configurations of our State and its municipalities." Ibid. (citing Jackman, supra (49 N.J. at 419, 231 A.2d 193)).
In affirming the judgment and returning the matter to the Commission for the preparation of a new plan, Scrimminger emphasized that it could not predict what range of deviation would be bad per se, writing that "there is no range of deviation within which a State may maneuver with or without reason. The constitutional command is to achieve equality, and hence a deviation may not exceed what an acceptable thesis of apportionment inevitably requires." Ibid. (citing Jones v. Falcey, 48 N.J. 25, 37, 222 A.2d 101 (1966)). The new plan was the subject of Davenport I, supra (63 N.J. 433, 308 A.2d 3). As the Supreme Court noted, the Appellate Division decision had expressed some doubts about whether Scrimminger's pronouncements had to be followed strictly in light of the intervening opinion in Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), where the United States Supreme Court had allowed a 16.4% range of deviation where necessary to achieve important state goals. Davenport I, supra (63 N.J. at 435, 443-444, 308 A.2d 3). Davenport I noted that Scrimminger had determined that even while exceeding the range of deviation by more than 26%, New Jersey's stated goal of giving each county its voice in the Legislature could not be achieved. Id. at 440, 444, 308 A.2d 3.
Davenport I determined, therefore, that Scrimminger's holding was intact, but considered a new concern: even though the whole county concept plan was not to be followed, did the New Jersey Constitution require that a districting plan be drawn to adhere to as many county lines as possible? Id. at 446, 308 A.2d 3. The Court determined that the record was inadequate to address the question, and permitted the parties to file additional materials. Id. at 447-448, 308 A.2d 3.
Davenport II followed the submission of those additional materials. In Davenport II, supra (65 N.J. at 130-131, 319 A.2d 718), the Court reviewed the prior cases, including Scrimminger's conclusion that decided that the foregoing State constitutional mandate with respect to using counties as building blocks could not be enforced under the demographic pattern, revealed by the 1970 census. As a result, the districting structure called for by present Article IV has been declared to be in violation of the Federal Constitution under the one-man, onevote principle.
[Id. at 132, 319 A.2d 718.]
The Court added a footnote to that final sentence: "New constitutional provisions for our State legislative structure would seem to be in order." Ibid. n. 2. No such constitutional provisions were approved.
The argument in Davenport II was that the county unit was a political entity, so as many Senate districts as possible should be placed within whole counties as the New Jersey Constitution required. Id. at 132, 319 A.2d 718. The Court rejected this argument, stating:
We find no such meaning in Article IV, nor do we think valid apportionment policy requires such result. On the contrary, we think it clear that attempting to preserve some semblance of county voting strength would create a plethora *1274 of constitutional problems. Were dilution of county voting strength a required consideration in applying one-man, onevote, the degree of dilution would have to be considered and equalized along with population, a difficult if not impossible task to perform.
We are satisfied that once the use of counties as building blocks was declared unenforceable, as it had to be under the demographic pattern shown by the 1970 census, the county concept ceased to have any viability in the creation of Senate districts.
[Id. at 133, 319 A.2d 718.]
A wide disparity still remains between county populations.
Plaintiffs are correct in asserting that the case law to date did not expressly address the municipality districting standard. Scrimminger called municipalities the "appropriate building blocks for the creation of districts." Hence, any plan that ignored municipality boundaries would violate the Court's direction. The Court's statement that the "boundaries of the larger municipalities will of course have to be breached" was not a directive to abrogate the Constitution's municipality districting standard. The constitutional standard has two parts: it prohibits dividing a municipality among Assembly districts unless it contains more than onefortieth of the state's population, and then it directs that no subdivision shall be among "a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by onefortieth of the total number of inhabitants of the State." N.J. Const. Art. IV, § 2, ¶3. Thus, the municipality districting standard applies only to those municipalities that are larger than the ideal district population, which presently includes only Newark and Jersey City. As to each of them, the municipality districting standard calculation results in a maximum of two districts: for Newark, 1 + (the whole number resulting from 273,546 210,359, which is 1.30), so 1 +1=2; for Jersey City, 1 + (the whole number resulting from 240,055 - 210,359, which is 1.14), so 1 + 1=2. Nothing could be clearer or more basic.
The only direction in any case as to the municipality districting standard was Scrimminger's further statement that "in this regard, the Commission may have to depart from the direction in Art. 4, § II, ¶ 3, concerning the division of a municipality." Scrimminger, supra (60 N.J. at 498, 291 A.2d 134). Thus, there is clear merit to plaintiffs' position that this statement does not constitute clear direction that the provision has been abrogated.
The Commission's position that because the county districting standard and the municipality districting standard were set forth in the same constitutional provision, Scrimminger and Davenport resulted in abrogation of both standards is erroneous. Such an argument does not square with the Court's direction in those cases that although county lines could not be followed because of the mathematical inequities, the municipality lines should be, wherever possible, except for cities with populations above the ideal population by more than a few percentage points, which are only Jersey City and Newark. Scrimminger, supra (60 N.J. at 497-498, 291 A.2d 134).
The motion judge's conclusion that the municipality districting standard provision in our Constitution somehow had been abrogated relied upon the fact that Davenport upheld a redistricting plan that had divided Newark and Jersey City into four and three legislative districts, respectively. However, the reported opinions did not address any variance from the municipality districting standard. In our earlier decision *1275 in Davenport v. Apportionment Commission, supra (124 N.J.Super. at 42, 304 A.2d 736), we had noted that the plan used municipalities "as building blocks, with necessary exceptions in the case of Newark and Jersey City" but this did not reflect any recognition or acceptance of the fact that Newark and Jersey City had been divided into more districts than the municipality districting standard would allow or rule on that issue. The Davenport plaintiffs resided in Union, Morris, and Passaic Counties, and their complaint challenged the apportionment of their home municipalities into districts largely comprised of municipalities in other counties. Id. at 34, 304 A.2d 736. Davenport made no mention of the undue fragmentation of Jersey City and Newark, nor even of the municipality districting standard; use of the county lines was the focus. Davenport II, supra (65 N.J. 125, 319 A.2d 718). Thus, there is no basis for concluding that the Davenport opinions allowed or affirmed a decision to deviate from our Constitution's municipality districting standard. The cases simply never addressed it. In any event, just because constitutional error was overlooked in the past neither makes the prior error right nor constitutional.
Thus, plaintiffs have met their burden by (1) showing that Jersey City and Newark were divided into three districts instead of two, and (2) drawing a map that apparently divided those cities into only two districts, and asserting that it complies with all federal and state districting requirements. Paramount is the one-person, one-vote principle of population equality. Jackman, supra (49 N.J. at 418, 231 A.2d 193). Summary judgment for defendants was hardly appropriate on the basis of the record before the court.
See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
No federal law expressly preempts the municipality districting standard and no State case has abrogated that standard. The federal Equal Protection Clause precludes basing districts upon race without regard for traditional redistricting principles. Robertson, supra (148 F.Supp.2d at 453). The State Constitution requires contiguity, Scrimminger, supra (60 N.J. at 498, 291 A.2d 134), respect for municipal boundaries, id. at 497-498, 291 A.2d 134, and to a lesser degree, compactness. Davenport II, supra (65 N.J. at 133-134, 319 A.2d 718).
Plaintiffs are correct in asserting that the municipality districting standard remains a part of New Jersey constitutional law. The Constitution is our basic organic document that all State officials, including Judges, Legislators and the members of the Legislative Apportionment Commission take a solemn oath to uphold. The Constitution is neutral and blind to extraneous factors, and fully applies here, as it always has since adopted. The plain and unambiguous language of our State Constitution, which we are bound to apply, requires us to reverse and remand.
Accordingly, we reverse and remand to the Commission for preparation of a new redistricting plan in compliance with the Constitution's municipality districting standard. The new plan would be applied prospectively.[6]
NOTES
[1] The complaint named Deforest B. Soaries, Secretary of State of New Jersey, and John Farmer, Attorney General of New Jersey, as defendants. Pursuant to R. 4:34-4, their successors in office have been substituted in the caption above.
[2] From the reported cases it appears that deadlocks are an historical fact of political history in redistricting.
[3] This information was apparently not in the population data from the U.S. Census Bureau reflected in a document in the record titled:

"Table 7, Population for the Counties and Municipalities in New Jersey: 1990 and 2000."
[4] For all practical purposes there is no distinction in the use of the word population, which derives from the Latin language, and the word demographics, which derives from the Greek language. Each means the populous or people.
[5] The 2001 plan was the subject of two reported federal court cases, Page v. Bartels, 144 F.Supp.2d 346, 366-369 (D.N.J.2001), (The 27th, 28th, 29th, and 34th Districts, withstood challenges under the Federal Constitution's Equal Protection Clause and Fifteenth Amendment and the Voting Rights Act, 42 U.S.C.A. § 1973 to § 1973p., and Robertson v. Bartels, 148 F.Supp.2d 443, 453-459 (D.N.J.2001)), aff'd, 534 U.S. 1110, 122 S.Ct. 914, 151 L.Ed.2d 881 (2002) (dismissed challenges to new 27th and 34th districts on res judicata grounds following Page, and alternatively found claims of impermissible racial gerrymandering and disparate treatment of incumbent legislators based upon race were meritless). Of course, neither decision is binding on our courts. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80, 577 A.2d 1239 (1990).
[6] Lonegan v. State, 174 N.J. 354, 355, 807 A.2d 174 (2002) and 174 N.J. 435, 503, 809 A.2d 91 (2002) (Stein, J., concurring in part and dissenting in part).